This attorney-general's bill, under the Blue Sky law, is to prevent fraud upon the public through the sale of stock of Home Brewery, Incorporated, by false representations.
The promoters, Hoey and Schultz, contracted to buy from the Krueger Company, formerly well-known brewer, one of its breweries in Newark, the Home Brewing Company, for $237,500. They agreed to pay $7,500 in cash, take the brewery subject to a $75,000 mortgage, and give a purchase-money mortgage for the balance, $155,000. Hoey and Schultz were to form a company to take over the contract. The contract was made September 13th, 1932, and Schultz, taking his word for it, forthwith surrendered his interest in it to Hoey. On September 23d, Schultz incorporated the Home Brewery, Incorporated, with an authorized capital stock of one million shares, par value $1. The company bought the contract from Hoey, giving two hundred thousand *Page 514 
shares for it. Later the company took title. R.S. Velsey Company, Incorporated, of New York City, stock promoter, was given a call for three hundred thousand of the company's shares at $1 a share, with an option for two hundred and fifty thousand more. Hoey also handed his shares over to the same promoter for sale. The Velsey company sold the shares at $1.50 and $1.75 a share by atrocious misrepresentation in literature and through high pressure salesmanship. It also altogether suppressed the fact that Hoey's two hundred thousand shares were promoter's allotment. One of the intriguing and vicious advertisements of the Velsey company was a supposititious balance sheet of the company showing a surplus of $737,501, thus:
 "HOME BREWERY, INC.
 Initial offering 300,000 shares
 Pro Forma Balance Sheet
 Based on Company's balance sheet
 after giving effect to completion of proposed financing.
 ASSETS
Current Assets:
 Cash ................................... $180,000.00
 Inventory (materials, bottles, c.) .... 10,000.00
 ____________
 Total ............................... $190,000.00
Fixed Assets:
 Land (appraised value) ................ $477,500.00
 Buildings (appraised value) ........... 350,000.00
 Machinery and equipment, including
 proposed additional equipment ....... 440,000.00
 Furniture and fixtures ................ 10,000.00
 _____________
 Total ............................... $1,277,500.00
Good will, trade names, c. ............. 1.00 1.00
 ______________
 Total Assets ........................ $1,467,501.00
 LIABILITIES
Mortgage on Plant ....................... $230,000.00
Capital stock:
 500,000 shares to be outstanding after
 completion of present financing ..... 500,000.00
 Surplus ............................... 737,501.00
 ____________
 Total Liabilities ................... $1,467,501.00."

The company hadn't a cent in hand. *Page 515 
Velsey company sold some $15,000 of the Hoey stock and four hundred and thirty seven shares of the company's unissued shares, up to the time the attorney-general stepped in and the court enjoined the fraud. Schultz and his associate directors now profess surprise at the Velsey methods, but I haven't the slightest doubt that they knew of this piece of false literature upon which their names appear as officials of the company and as its sponsors. None denies that he knew and acquiesced. In fact, the directors maintain that the brewery property is of the value as represented by Velsey in the misleading statement, and that the company has a surplus of $600,000 and upwards. That is a pretense and absurd, and to use it as a basis for future sales of stock would be a fraud. That they proposed doing. They also justify the issue of the two hundred thousand shares to Hoey, claiming that his contract was well worth it. By some peculiar mental twist, common to promoters, they profess to believe that their purchase of a $237,500 brewery, from a conservative owner, suddenly transformed itself into an over a million dollar profit possession, and this piece of "blue sky" they want to sell the public, plus the gamble of high profits if and when beer comes back — when prohibition is no more. They ask the public to speculate upon that event. If it does not come to pass it loses. If it does eventually, it may take years, and in the meantime the brewery remains closed, it loses. None of the promoter-directors have a penny invested; each has a thousand shares given to him by Hoey. They sing the praise of the enterprise when and if, and fulsomely their own and each other's special qualifications to carry on if and when the brewery is allowed to again operate, and the riches that will follow, but themselves seem unwilling to invest their own money and take the chance; the risk is passed on to the gullible public.
Velsey Company, Incorporated, Hoey and Home Brewery, Incorporated, will be enjoined from the sale of the stock. Velsey company because it perpetrated the fraud; Hoey, because Velsey company's misdeeds are imputable to him; Home Brewery, Incorporated, because Velsey company's fraud *Page 516 
is imputable to it; it made the fraud possible, sanctioned it and accepted the spoils.
The directors escape because of failure of proof that they directly participated in the fraud.
The directors now offer to do better if the injunction is lifted — to secure a dependable broker.
There can be little doubt that if the sale of beer is legalized, the brewery property will take on an imposing value. Upon that event application may be made to modify the injunction upon assurance of rectitude in sales. Motion may also be made before a decree is entered, for a provisional injunction upon full disclosure to the speculating public of the true situation of affairs and of the hazard.
The defendants assail the constitutionality of the act under which these proceedings are prosecuted. The original act of 1927 (P.L. 1927 p. 138) prohibited the fraudulent sales of securities within the state. In 1931 (chapter 226) the act was amended to prevent the sales in other states "from within this state." The title of the amending act is entitled as an amendment of, reciting the title of the original act. The amendment extends the subject-matter of the original act, it does not introduce an additional subject foreign to the original title as in Heddon
v. Hand, 90 N.J. Eq. 583, relied upon to support the point that the amendment transgresses paragraph 4, section 7 of article 4 of our constitution, in that the object is not expressed in the title.
The Heddon Case is also cited as authority for the proposition that the act unconstitutionally vests in chancery a jurisdiction conferrable only upon the law courts. The prevention and redress of fraud is equity's birthright. Chancery came into being because the law courts failed or refused to take cognizance of unconscionable conduct. The prevention of fraudulent imposition upon individuals or the public is exquisitely within chancery's province and its weapon the injunction. The act dealt with in the cited case conferred jurisdiction upon chancery to suppress existing evils, public nuisances (crimes), a subject of redress peculiar to the law courts, in the criminal division, and consequently inhibited *Page 517 
by the constitution. The Securities act on the contrary, is purely preventive, protecting individuals as members of the public from the racketeer in securities, suppressing him, it is true, but only as a preventive measure against further fraud. The act is not redressive; it has penalties, but their vindication is left to the criminal courts. The receivership provision is not redressive against the culprit, but a means of gathering the loot for restoration to his victims. In none of these features does the act infringe upon the inherent jurisdiction of the law courts, civil or criminal. The law courts redress wrongs; equity apprehends and prevents them, and that cardinal distinction of the two jurisdictions was observed by the legislature in committing to chancery the enforcement of its newly adopted policy of arresting fraud instead of redressing it after the harm is done.