**Samuel H. MOERMAN, Plaintiff,**

v.

**ZIPCO, INC., Arthur M. Lewis, Trustee in Bankruptcy, Samuel Nasser, Joseph C. Snyder, Joseph Nasser, Donald S. Brodeur, Morris J. Bibi and Isidore Dayan, Defendants.**

No. 63–Civ.–922.

United States District Court
E. D. New York.

July 31, 1969.

Battle, Fowler, Stokes & Kheel, New York City, for plaintiff; by Raymond F. Gregory, New York City, of counsel.

Handelsman, Arutt & Knox, New York City, for defendants Samuel Nasser, Joseph C. Snyder, and Joseph Nasser; by Maxwell Handelsman, Joseph J. Einhorn, New York City, of counsel.

Ferris, Adams & Creidy, New York City, for defendants Morris J. Bibi and Isidore Dayan; by Albert Adams, New York City, of counsel.

JUDD, District Judge.

### OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

This action, tried without a jury, is a claim by a shareholder for alleged violations of the federal securities laws and the Connecticut Blue Sky Law. Findings of fact and conclusions of law are made herein pursuant to F.R.Civ.P. Rule 52(a).

The defendants Sam Nasser, Joseph Nasser, Joseph Snyder, Morris Bibi, and Isidore Dayan were directors of Zipco, Inc. from its inception. The two Nassers and Snyder were also officers. The action has been discontinued against another director, Donald S. Brodeur. Arthur M. Lewis, Zipco's trustee in bankruptcy, has not answered the complaint, but there are no assets for distribution to creditors.

#### The Zipco Venture

In 1960, defendant Sam Nasser obtained a license to produce and sell monofilament nylon zippers in the United States. The patent was owned by Lysta A/s, a Danish corporation. The license was assigned to a newly formed Connecticut corporation, Zipper Corporation of America, Inc., which, in March, 1961, was succeeded by Zipco, Inc., a Delaware corporation. The stockholders of the Connecticut corporation exchanged their stock for shares in Zipco. There were some twenty-seven shareholders.

The plaintiff, Samuel Moerman, is an attorney specializing in matters before the Interstate Commerce Commission and the Maritime Administration. Since 1955, he has been President and Chairman of the Board of the American Hawaiian Steamship Company. He was first informed of Zipco in late July, 1961 through William Blum, also an attorney, who was counsel to Baruch & Company, underwriters of a Zipco stock offering intended to be registered with the Securities and Exchange Commission. Blum had been associated with the plaintiff's law firm from 1943 to 1946 and they had various business and social contacts since then. In fact, both had invested in the stock of other corporations prior to public offerings.

Moerman testified that he had "good reason" for not relying on Blum's recommendation and insisted on obtaining information from Zipco's President, Sam Nasser, prior to making a purchase. The

telephone conversations between Moerman and representatives of Zipco occurred in late July or early August, 1961. The content of these conversations, essential to the plaintiff's causes of action under the federal securities acts, was disputed. Without repeating all the conflicting testimony here, the relevant standards for determining the credibility of witnesses lead the court to determine the following facts.

Moerman's first call to Zipco was received by Joseph Snyder, Zipco's Vice President and a Director. Snyder was told that the plaintiff wished to buy 12,-500 shares at $2.00 a share. The stock was recommended by Blum, but Moerman wanted to get further details from Sam Nasser. The conversation was brief, ending with Snyder's saying that he would put Nasser in touch with Moerman.

When the message was delivered to Sam Nasser, he expressed surprise that such a large purchase might be made by a stranger. He telephoned Blum, stating that he would rather not sell such a large block of stock. Blum informed him that Moerman's position in the American Hawaiian Steamship Company would add "an air or * * * prestige to the company."

While Sam Nasser, when he called Moerman, may have urged him to accept less than 12,500 shares, he was certainly glad to have wealthy subscribers to Zipco stock. This willingness is demonstrated in Nasser's subsequent efforts to have Moerman obtain or contribute additional capital to prevent the eventual bankruptcy of Zipco. Nasser's testimony that he informed both Blum and Moerman that the stock issue was then oversubscribed is rejected. Further testimony by Nasser on direct examination revealed that only about 100 out of the 227 ultimate subscribers to the "pre-public offering" had signed subscription agreements before Moerman.

Blum was selling stock for Zipco in the Washington area. He had told Moerman that there would be just a few stockholders. Moerman repeated this statement to Sam Nasser, and Nasser did not disabuse him of the idea. Nasser did not tell Moerman that there were twenty-seven shareholders at the inception of Zipco, nor that at least seventy more persons had already signed subscription agreements. Moreover, he was never informed that there would be 227 subscribers to the 175,000 share issue.

A few days later, Moerman received a blank subscription agreement in the mail. He signed the form on August 9, 1961 and returned it to Zipco with partial payment in the amount of $15,000, which was deposited on August 11th. About August 26th, Sam Nasser telephoned to request the $10,000 balance, which Moerman promptly forwarded. The agreement was accepted by Zipco on August 29th and given certificate number 134. A copy was returned to Moerman.

Defendants make much of the certificate number. While conceding that the number 134 does not necessarily represent that there are at least 134 shareholders, they insist that since Moerman was, in his words, "vitally concerned" that there be only a small group of investors, he had a duty to inquire. Moerman's testimony was that he did not notice this number and if he had, it would not have been meaningful to him. In any event, he had already purchased the shares, basing his decision on what Nasser had told him or omitted to tell him. The subsequent discovery of the true facts is material only to the statute of limitations, discussed below.

Moerman began receiving "Zipco reports," describing the progress of the company. While these reports contained statements such as "The letters and comment from so many of you" and "Several stockholders have inquired," such statements show only that Moerman may then have been on notice that there was more than a handful of stockholders, not that he was wrong in his testimony about the original representations. A report dated April 11, 1962 stated that the underwriter was having difficulty with the Securities and Exchange Com-

mission, that the underwriting agreement with Zipco had been terminated, and that the company was looking for another underwriter of its public offering.

In July, 1962, a draft registration statement was received by Moerman. The proposed public offering was 300,000 shares of $.10 par value common stock to be offered at $5.00 per share. Under the title "Offer of Rescission." the draft statement provided:

"In the first 10 days of August 1961, the Company sold 175,000 shares of its common stock at a price of $2 per share to approximately 227 individuals, of whom 27 were the original promoters of the Company. The Company received the proceeds of the sale, but has not yet issued any shares of stock to the purchasers. The proceeds of the sale were applied to the purchase of the license, manufacturing and other equipment from LYSTA necessary to engage in manufacturing operations. The Company has been informed by counsel that these sales may have violated the Securities Act of 1933 and the Securities Act of the State of Connecticut, and created a contingent liability on the part of the Company upon tender of the shares for recission to return the consideration received by the Company plus interest thereon from the date of the sale."

I find that this was the first unequivocal knowledge Moerman had that there were more than a few shareholders of Zipco stock. Moerman was invited to become part of a group to buy the stock of any shareholders who elected to rescind, but he refused to do so. He had indicated in a letter to Nasser on September 4th that he wished to "tender back my stock at the first opportunity," citing "changes in my personal situation." When the offer of rescission was presented on December 7, 1962, Moerman promptly accepted.

## Statutes and Defenses

On these facts, plaintiff seeks recovery from all defendants under Sections 12(1) and 12(2) of the Securities Act of 1933; Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5 promulgated thereunder (17 C.F.R. § 240.10b–5); and Sections 36–267 and 36–312a of the General Statutes of Connecticut.*

Defendants assert the statute of limitations as a defense to each cause of action.

Other occurrences, which give rise to a claim by defendants that Moerman waived his rights, are discussed below. Still other facts, subsequent to Moerman's election to rescind, are relevant to plaintiff's claim that defendant Sam Nasser is estopped to plead the statute of limitations; these are discussed in a later portion of this opinion.

## Section 12

Section 12(1) (15 U.S.C. § 77l) permits the purchaser of securities sold in violation of Section 5 (15 U.S.C. § 77e) to recover the consideration paid. Section 5 makes it unlawful to use any means of communication in interstate commerce to offer to sell securities unless a registration statement has been filed. Section 12(2) allows recovery based upon misrepresentations or omissions of material fact in connection with the sale of securities.

Although defendants described the offering to Moerman as part of a "prepublic sale," they do not now contend that the offering of August, 1961 was exempt from Section 5 as a non-public offering under Section 4 (15 U.S.C. § 77d). S.E.C. v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); Repass v. Rees, 174 F.Supp. 898 (D.Colo.1959). Rather, the defendants have relied on the statute of limitations. On this basis, the court granted a motion to dismiss the Section 12 causes of action against all defendants except Sam Nasser. As to him, sufficient evidence

---

\* These sections were amended in 1967 and renumbered §§ 36–322 and 36–346, respectively.

was presented to raise the possibility of estoppel, and the complaint was deemed amended to so plead.

An action under Section 12(1) must be brought within one year after the occurrence on which it was based. The statute of limitations applicable to Section 12(2) is one year after the discovery of the untrue statement or omission, or after discovery should have been made by the exercise of reasonable care. In no event may the action be brought more than three years after the sale. 15 U.S.C. § 77m. (Section 13).

The violation occurred on August 29, 1961, when Zipco accepted plaintiff's subscription. The misrepresentations and omissions were discovered in July, 1962, when the draft registration statement was received. Reasonable diligence was exercised by the plaintiff in discovering the facts. This action was commenced on August 9, 1963. Limitations therefore bars the action unless Sam Nasser is estopped to plead the defense.

The Court of Appeals for this Circuit has recently held that the case for invoking the principle that no man can take advantage of his own wrong "is particularly strong with a statute of limitations so short as § 13." Katz v. Amos Treat & Co., 411 F.2d 1046 (2d Cir. May 16, 1969). In that case, the plaintiff had no reason to seek relief under Section 12(1) while the defendants assured him that a public offering would soon be made. Here, plaintiff claims that Sam Nasser encouraged him to believe that the offer of rescission would be made good.

Nothing precluded the plaintiff from commencing a timely suit in July, 1962 when he discovered the offering was not private. Having expressed concern about the sufficiency of Zipco's capital, he had reason to doubt its continued solvency. After the offer of rescission was executed, various plans for the payment of rescinding shareholders were proposed and communicated to Moerman. Several companies were considering taking over

Zipco and paying the rescinding shareholders over a period of time.

Moerman received a summary of a meeting of creditors held on February 25, 1963. It indicated that efforts were being made to obtain new capital, and urged creditors not to institute suits or bankruptcy proceedings. The attached balance sheet notes that $246,500 was due to rescinding shareholders. It reflects cash of $391.00 and an accumulated loss of $448,460. The overall impression is that the outlook for Zipco is not bright and that payment of rescinding shareholders, if made, would be delayed.

Another take-over plan was formulated and conveyed to Moerman by letter in May, 1963. As a result, Sam Nasser and Moerman met in late May or early June. Nasser urged Moerman to assist the company in preventing the banks and the Small Business Administration from initiating bankruptcy proceedings. Moerman said he could do nothing to help. Aware of the pending bankruptcy, Moerman nevertheless delayed initiating this action for over two months. He might have preserved his remedy under Section 12(2) by suing in mid-July, 1963, which would have been one year from the discovery of the misrepresentations. Nothing explains the delay until August 9th.

Moreover, this evidence does not support Moerman's claim that he relied on Nasser's promise that rescinding shareholders would be paid. In fact, there was never a promise on which the plaintiff, an attorney and businessman, could reasonably rely. See Restatement, Contracts § 90. All take-over possibilities were tentative; Nasser never represented that recovery or take-over of Zipco was certain. None of the defendants "took any affirmative action to lull plaintiff into a false sense of security." Robbins v. Esso Shipping Co., 190 F. Supp. 880, 885 (S.D.N.Y.1960). Sam Nasser only informed Moerman of the facts on which he made a decision to delay suit. There is no basis for an

estoppel to rely on the statute of limitations.

The plaintiff's Section 12 causes of action, being barred by the statute of limitations, are dismissed.

### Rule 10b–5

The familiar Rule 10b–5 makes it unlawful for any person, by the use of any means of interstate commerce,

> "(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading * * * in connection with the purchase or sale of any security."

■ Since the complaint was filed within two years after the sale, the statute of limitations provides no defense. N.Y. CPLR § 202; Connecticut General Statutes § 52–577; Marth v. Industrial Incomes Inc., 290 F.Supp. 755, 757 (S.D.N.Y.1968).

■ In this Circuit, it appears that mere negligent misstatement of fact in connection with the sale of a security is insufficient to warrant recovery in an action for damages. Heit v. Weitzen, 402 F.2d 909, 913 (2d Cir. 1968); Gerstle v. Gamble-Skogmo, Inc., 298 F.Supp. 66, 97 (E.D.N.Y.1969). Rather, some type of scienter must be shown, in addition to materiality and reliance upon the untrue statement or omission.

■ Sam Nasser was admittedly aware of the fact that there would be more than a few shareholders. His omission to tell Moerman the number of shareholders, or to correct the impression that Blum had given him that there would be only six or eight investors, was material in the sense that a reasonable man would have attached importance to it in determining his course of action. List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

In addition to the misrepresentation as to the number of initial shareholders, plaintiff points to numerous other omissions of facts which may have been material. Nasser did not tell Moerman that the stock was being offered by word of mouth to the public and that there were already almost 100 shareholders. He did not disclose his own ten-year employment contract with Zipco or that the company would apply for a $350,000 loan to facilitate the purchase of a plant site. Of these, however, only the omission of the number of shareholders and the publicity of the offering would have influenced Moerman to act differently. List v. Fashion Park, Inc., *supra*, 340 F. 2d at 463. Whether stated as an untrue statement or an omission, materiality was established.

Defendants contend that Moerman relied more on the untrue statement of Blum than on that of Nasser. Blum, who relayed the "tip" to Moerman, stated that there would be a pre-public offering to a "few key people." He also acted as a salesman of Zipco stock, soliciting subscription agreements from his associates. Blum then knew that Moerman was being misled and that the stock offering was going to more persons than the securities law would permit prior to registration. Certain evidence indicates that Moerman relied to some degree on Blum's recommendation of Zipco stock, casting some doubt on his complete repudiation of all reliance on Blum's statements. Nevertheless, Moerman insisted on talking with Nasser before acting. Nasser confirmed Blum's statement that Moerman was one of a small select group of original stockholders, or at least did not correct the impression that he knew Moerman had received. He is therefore liable under Rule 10b–5, without having to determine whether Blum was a Zipco agent for whose acts he was responsible.

### Controlling Persons Within Rule 10b–5

Since Moerman had no significant contact with any defendant other than Sam Nasser, the liability of the other defendant officers and directors must rest solely on Section 20 of the Securities Ex-

change Act of 1934 (15 U.S.C. § 78t), which states:

"(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

This section requires the resolution of two issues: (1) were the defendants controlling persons of the person liable, and if they were, (2) are they entitled to the defense of good faith.

■■■ There is no dispute that defendants Snyder and Joseph Nasser were both officers and directors of Zipco. On the other hand, defendants Bibi and Dayan claim that since there was no proof that they were directors appointed in accordance with Delaware law, they cannot have controlled Zipco or Moerman. While the corporate minutes of their appointment were not produced, sufficient evidence established that both acted as directors from the formation of Zipco. Sam Nasser testified that Bibi and Dayan insisted on being members of the board. They had sold Zipper Corporation of America stock to some of the initial shareholders and were to represent a large portion of the total shares on the board. In fact, they had raised a substantial portion of the initial capital. In addition, they signed board minutes and registration statements as directors. The S–1 form, filed in the Securities and Exchange Commission with signatures of Bibi and Dayan as directors, stated that the defendant directors had all been associated with the company since its formation. Nasser stated that while he was president and had full control of the day-to-day operations of Zipco, the board was not a "rubber stamp," and Bibi and Dayan actively participated in board meetings. The conclusion is inescapable that persons who act as directors are in control of the corporation. This is especially true in light of the liberal construction of this section as including "indirect means of discipline or influence short of actual direction." *Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir. 1967), cert. denied 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968).

■■■ Zipco is liable for the fraud of its agent, Sam Nasser. The control of Zipco included indirect control of Nasser. Thus, all the directors may, by their control of Zipco, be responsible for the acts of Nasser, unless they have sustained the burden of proving that they "acted in good faith and did not directly or indirectly induce the act or acts constituting the * * * cause of action."

■■■ The acts constituting the Rule 10b–5 cause of action are the sale of securities to Moerman and Nasser's misstatement and omission of material facts. The uncontradicted evidence is that none of the defendants knew or in any way induced Nasser's fraud. While other defendants participated in the sale of unregistered securities for which they may have incurred personal liability under Section 12(1), no plan or conspiracy to defraud purchasers was shown. Indeed, apparently no other shareholder has commenced suit, although a large number of those who purchased the unregistered issue elected to accept the offer of rescission.

The degree of control the defendants were able to exercise over Sam Nasser or Zipco was not similar to an employer-employee or an agent-principal relationship. Cf. *Hawkins v. Merrill, Lynch, Pierce, Fenner & Beane*, 85 F.Supp. 104, 123 (W.D.Ark.1949); *Paul H. Aschkar & Co. v. Kamen & Co.*, CCH Federal Securities Law Reporter ¶ 91,565 (S.D. Cal.1964). Directors cannot be expected to exercise the kind of supervision over a corporation president that brokers must exercise over salesmen. *Lorenz v. Watson*, 258 F.Supp. 724, 732–733 (E.D. Pa.1966). Therefore, those cases which

hold that the defense of good faith is not available to controlling persons who induce the purchase of shares are inappropriate. *E. g.*, Myzel v. Fields, *supra*, 386 F.2d at 738–739.

The court concludes that only Sam Nasser is liable for the violation of Rule 10b–5.

### The Connecticut Blue Sky Law

Plaintiff also seeks recovery under Sections 36–267 and 36–312a of the Connecticut General Statutes as they existed in 1961. Section 36–267 requires persons who sell securities from or within Connecticut to register as a broker, dealer or salesman. Persons who sell without registration are made liable under Section 36–312a. Subsection (b) provides:

> "Every person who directly or indirectly controls a seller liable under subsection (a) of this section, every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale and every broker or dealer or salesman who materially aids in the sale shall be liable jointly and severally with and to the same extent as the seller, unless the non-seller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care would not have known, of the existence of the facts by reason of which the liability is alleged to exist. There shall be contribution as in cases of contract among the several persons so liable."

■ The statute of limitations defense in the answer must be dismissed, because it is clear that the action was timely commenced. The purchase was not effected on August 9, 1961, when Moerman signed the subscription agreement, but only on August 29th, when Zipco accepted it. Even if the deposit of Moerman's first check on August 11th were taken as the date of purchase, his complaint, filed on August 9, 1963, commenced the action within two years after the claim accrued. § 36–312a(e).

It is not disputed that Moerman complied with Section 36–312a(e) by accepting the written offer of rescission within thirty days. It is also beyond dispute that defendants are directors or "persons occupying a similar status or performing similar functions."

The defendants contend only that plaintiff failed to prove that Zipco or its salesmen were not registered under this act, and that the defense provided in subsection (b) has been established.

The words "broker" and "dealer" in Section 36–267 are defined in Section 36–265(c) as including "a corporation publicly selling or offering for sale its security or securities." A salesman is a person authorized by a broker or dealer to sell or offer to sell securities in Connecticut. Thus, both Zipco and each of the defendants who sold stock were required to register.

■ There was never any claim by defendants that they or Zipco had registered under the Connecticut statute, but only that plaintiff had the burden of proving that they had not registered. Their statement in the S.E.C. Form S–1 that they were informed by counsel "that these sales may have violated * * the Securities Act of the State of Connecticut" is not a precise admission of failure to register, but it is some evidence of non-registration. *Cf.* State v. Whiteaker, 118 Or. 656, 247 P. 1077 (1926).

Proof of the absence of registration by Zipco was presented by an attorney associated with the firm representing the plaintiff. He testified that he visited the Office of the Securities Director of Connecticut and examined a volume entitled "Brokers Register" for the years 1959 to 1962. These years were located on seventeen pages. He looked for the names Zipco, Zipper Corporation of America, and Baruch & Company, the original underwriters. He found no registration noted.

Defendants would have this testimony stricken, and argue that only the books themselves or certified copies would satisfy 28 U.S.C. § 1739. However, that section merely provides a means for the authentication of official records. Where records are in official custody, open to inspection by all parties, secondary evidence is admissible. United States v. Mortimer, 118 F.2d 266, 269 (2d Cir. 1941). This is especially true where the records are outside the jurisdiction of the court.

Defendants suggest that it was not enough to examine the "Brokers Register," because there may have been a Dealers Register as well. They offered no evidence of the existence of any such volume. Since the Connecticut statute has only one definition for " 'Broker' or 'dealer' ", there could not be separate registers for brokers and for dealers. Sam Nasser testified that when he visited the Connecticut Securities Department, he was shown "a large book of broker-dealers and another large book of salesmen," and that he looked at the broker-dealer book.

The defendants had ample opportunity to inspect the records and were even permitted to add proof after trial that one of the Connecticut attorneys for Zipco, not a defendant here, had registered as a salesman in July, 1961. In reporting this post-trial discovery, they did not assert that they had found any registration for Zipco or for any of the defendants. The inescapable conclusion is that neither Zipco nor any of the defendants ever registered.

A more troublesome question is presented by the defense that the defendants did not know "the facts" on which liability is based. The statute does not define which facts are meant, and apparently this section has never been construed by the Connecticut courts, or by courts in any other state with a similar statute. However, the statute's language is similar to Section 15 of the Securities Act of 1933 and Section 410(b) of the Uniform Securities Act.

It is clear that liability here rests on the sale of unregistered securities. Knowledge of fraud is immaterial, distinguishing this defense from the good faith defense to the Rule 10b(5) cause of action. Cf. 53 C.J.S. Licenses § 77, pp. 772, 780, 787 (1948). It is also certain that all the defendants, as directors and salesmen, knew that the stock was being offered publicly. What is disputed is whether the liability of the defendants requires proof that they also knew that the sale of unregistered securities violated the Connecticut statute.

The defendants insist that they exercised reasonable care, and yet did not know of the statute. They point to their own alleged lack of business acumen and their reliance on the advice of a firm of Connecticut attorneys, one of whom served on the board of directors and sold Zipco stock. Any suit against him is statute-barred. This attorney was the only person to register. They point to two letters which this attorney wrote to the corporation and to a broker some months *after* Moerman's purchase, stating that the issuance of the Zipco stock was duly authorized, and that its directors' minutes and other records conformed with all applicable laws and regulations. These routine letters are far from any confirmation of their assertion that he said the stock could be sold publicly.

In any event, their argument misses the mark; the statute imposes liability on those who know the applicable facts, without regard to reasonable care.

In the cases decided under Section 15 of the Securities Act of 1933 in which the court dealt with knowledge of "the facts," ignorance of the law was not interposed as a defense or considered by the court. E.g. DeMarco v. Edens, 390 F.2d 836 (2d Cir. 1968); Stadia Oil & Uranium Co. v. Wheelis, 251 F.2d 269 (10th Cir. 1957); Zachman v. Erwin, 186 F.Supp. 681 (S.D.Tex.1959). Similarly, the defendants have not cited any case holding that ignorance of the law is a defense to federal or blue sky liability.

**450**

Nothing persuades this court that Connecticut or the drafters of the Uniform Laws intended to do away with the common law rule that ignorance of the law is no defense. The Connecticut statute provides only that ignorance of the applicable facts, after the exercise of reasonable care, is a defense. There is no suggestion that defendant's knowledge of the law is a necessary element of a cause of action. Buttrey v. Guaranteed Securities Co., 78 Utah 39, 300 P. 1040 (1931).

The only facts necessary to establish liability under the Connecticut statute are that stock was sold, and that it was not registered. The defendants knew that $350,000 worth of stock was being sold. There was no requirement that they know of the particular sale to plaintiff. In defining liability, the statute imposes liability on an employee of a seller only if he "materially aids in the sale," but it puts no similar restrictions on the liability of a partner, officer, or director. As participants in meetings of the board of directors, all the individual defendants knew that the S.E.C. registration was something in the future, and it is a fair inference that they knew that there had been no Connecticut registration. It is doubtful whether they could defeat liability even by showing that they had no knowledge on this point, for they are charged with the duty to comply with a statute which requires registration, and in the exercise of reasonable care, they could have determined that there had been no registration by the corporation or any of the defendants under the Connecticut statute.

Nothing in the recent case of Katz v. Amos Treat & Co., *supra*, 411 F.2d 1046 requires a different conclusion. There two of the defendants became directors after the plaintiff was sold a block of unregistered shares. The plaintiff purchased additional shares while these defendants were directors. These directors were held not liable under Section 12(1) of the 1934 Act because they merely had knowledge of the sale of unregistered shares and had a minor role in facilitating the sale. (One of them signed the stock certificates.) No similar minor role was played by the defendants in this action. All authorized the unregistered shares and acted as salesmen. As directors and officers of Zipco, they were obligated to see that the company violated no law.

Defendants assert that they should not be held liable, because they are inexperienced, and plaintiff is a sophisticated investor. The answer is that a sophisticated investor will expect sellers of stock to have complied with statutory safeguards, and that these safeguards are for the protection of the entire public, including a careless sophisticate, and not just for the ignorant. Moe v. Coe, 124 Or. 436, 263 P. 925 (1928). Defendants' claim of good faith is greatly impaired, too, by their failure to produce as witnesses or by deposition any of the attorneys who they said had orally advised them that a "pre-public sale" could be made to any number of people.

### Waiver

Defendants Bibi and Dayan argue that Moerman waived any rights that he may have had under the Connecticut statute. This contention is based on a letter from Blum to Sam Nasser, dated September 12, 1962, a carbon copy of which was received by Moerman. This letter states:

"You raised the question as to whether you should start immediately to try to liquidate Sam Moerman's $2 shares. I think I have talked to him since he wrote the earlier letter and unless you receive additional instructions from him, I relay to you what he indicated to me that while he is not, at this time, agreeable to going into the underwriting, he was 'a little recovered' from the crushing news about his brother and that he would be willing to 'stand pat' for the time being on his shareholdings."

This letter must be read in light of a letter dated September 4, 1962 from

Moerman to Nasser, in which Moerman declared:

> "Further, these changed circumstances would require that I tender back my stock at the first opportunity. It may be that you can place the stock for me prior to any formal rescission offer and, if so, I would appreciate it."

It appears that the letter of September 12th meant only that Moerman was willing to wait for the formal rescission offer and would not demand that his stock be sold prior thereto.

There is therefore no merit to the contention of waiver.

Other arguments in defendants' briefs have been considered, but do not merit further mention.

### Relief

 The Connecticut statute provides for the recovery of the original purchase price, with interest at the rate of six percent, plus costs and reasonable attorneys fees.

Recovery under Rule 10b–5 would apparently be less than under the Connecticut statute. *Cf.* Ross v. Licht, 263 F.Supp. 395, 410–411 (S.D.N.Y.1967). Therefore, it is not necessary to determine the amount of Rule 10b–5 liability.

Plaintiff is entitled to judgment against defendants Sam Nasser, Joseph Snyder, Joseph Nasser, Morris Bibi (or his estate), and Isidore Dayan in the sum of $25,000 plus six percent interest from August 29, 1961.

### Attorney's Fee

While the defendants' papers do not discuss plaintiff's demand for a fee of $15,000, this demand seems excessive.

The basis for the claim of attorney's fees in the amount of $15,000 is 148 hours of partners' time and almost 78 hours of an associate's time, all prior to trial, plus four days spent in trial and preparation of extensive post-trial briefs. Not included is the time expended by a firm which initiated the action before the present firm was engaged. The records of the prior firm were not available and the precise number of hours was not proved. If lawyers' fees involved simply a computation of hours, multiplied by a fixed rate, plaintiff's claimed fee would be amply justified, but a court must consider other factors. Plaintiff would give little weight to the amount of the recovery.

Canon 12 of the canons of Professional Ethics requires that the amount in controversy be considered with other factors in setting the fee. Weighing all the factors, a reasonable fee for plaintiff's attorney to be paid by defendants is fixed at $10,000. Whether this is the limit of Moerman's obligation to his attorneys need not be decided.

The death of defendant Bibi after trial but before this decision necessitates that his representative be substituted in accordance with F.R.Civ.P. Rule 25(a). Rule 54(b) permits entry of judgment against less than all the parties only on express direction of the court.

The parties may submit applications for substitution and for judgment, on notice of two working days, supported by appropriate papers.