129 N.J. Super. 47 (1974)
322 A.2d 195
LOUISA COLA, PLAINTIFF,
v.
SPARTACO V. TERZANO, SIDNEY PACKER, CARVEL A. KLEE, I.I.S. FINANCIAL CORP., A PENNSYLVANIA CORPORATION, INTERAMERICA INVESTORS SERVICES, INC., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided June 5, 1974.
*50 Mr. Leon S. Wolk for plaintiff.
Mr. Robert Greenberg for defendant Spartaco V. Terzano (Messrs. Greenberg & Feiner, attorneys).
Mr. Herman B. Packer for defendants Carvel A. Klee, Sidney Packer, I.I.S. Financial Corporation and Interamerica Investors Services, Inc. (Messrs. Packer & Packer, attorneys).
VAN TASSEL, J.C.C., Temporarily Assigned.
This is a case involving the sale of unregistered stock in which the buyer seeks to invoke civil remedies under New Jersey's Uniform Securities Law, N.J.S.A. 49:3-47 et seq. In this regard it is a case of first impression in New Jersey.
The complaint and pretrial order sound in fraud and deceit; however, the court is permitting an amendment to conform to proof pursuant to R. 4:9-2, to include the violations of N.J.S.A. 49:3-47 et seq., since the facts alleged and testimony adduced provided reasonable notice as to the basis upon which relief was sought. See South v. West Windsor, 82 N.J.L. 262, 264 (Sup. Ct. 1912). R. 4:9-3 permits amendments to relate back to the date of the original pleading.
Spartaco V. Terzano was employed as a group manager of Interamerica Investors Services, Inc. (Interamerica) in the Hudson County area. As as agent of Interamerica he was authorized to sell shares of stock in I.I.S. Financial Corp. *51 (I.I.S.). Interamerica, a subsidiary of I.I.S., was a broker-dealer involved in the sale of mutual funds and insurance. Terzano was licensed to sell stock 14 years before the subject sale in this suit. He had attended an Investor's Planning Corp. formal training program relating to stock sales.
On January 14, 1971 Terzano visited the home of plaintiff Louisa Cola at the request of her son-in-law Ciriaco DiPalma. Terzano and the DiPalmas were to discuss the prospect of insurance for personal property within their home. Mrs. Cola owned the two-family home and was introduced to Terzano as a friend of DiPalma's for 20 years. Their discussion of insurance culminated in Mrs. Cola's purchase of a fire insurance policy on the house. DiPalma also purchased insurance from Terzano.
Thereafter, Mrs. Cola's nephew Mr. Barrota, who was seated at the living room table along with Terzano, Cola and the DiPalmas, began a discussion about investments in the Oppenheimer Fund. Terzano noted that this was a long-term investment and said that he was familiar with other investments which paid much more quickly. DiPalma then mentioned that Mrs. Cola had been involved in mortgage loans which paid 6% interest. Terzano replied that he knew of a company which "guaranteed" 9% "interest" as opposed to the 6%-7% flowing from mortgage investments. At the trial Terzano insisted that he used the word "dividend" and that plaintiff insisted that he used the word "interest" when discussing the terms of the investment. Terzano also claims that he used the word "return." He advised the group that his company had great potential, with offices "all over," and that an investment with his company would prove far more profitable.
Terzano remained at Cola's residence for approximately 2 1/2 hours during which time Mrs. Cola and Terzano discussed the details of an investment with Terzano's company. Louisa Cola, a 75-year-old foreign-born widow with no formal education, spoke very little English. She understood only, *52 through her son-in-law's translation into Italian, that she was investing her money in a Pennsylvania insurance company. She thought she was transacting an interest-bearing loan arrangement whereby she would receive a guaranteed 9% interest semi-annually. She was familiar with this type of arrangement since she had given mortgage investment loans through her attorney, Mr. Delchop, two or three times in the past, and in each had received back her capital and interest. According to her testimony, she was assured by Terzano that she could have her money back at any time; that if she died, her children would receive it and that the 9% interest semiannually was "guaranteed." Terzano's own testimony corroborates the "guarantee" representation.
That night arrangements were made by Mrs. Cola and Terzano to finalize the deal. The other members of her family were not aware of this or the fact that on January 16, 1971 Terzano drove Mrs. Cola to the Oritani Savings & Loan where she drew a check for $15,000. She endorsed it for deposit only, payable to I.I.S., and gave it to Terzano. He then forwarded it to his home office in Pennsylvania and later received a commission on the sale. On March 16, 1971 Mrs. Cola received a letter from Sidney Packer which acknowledged her purchase of 150 shares of I.I.S. 9% preferred stock at $100 a share. Packer indicated that the shares were to convert to 40 shares of common stock on April 15, 1973 and that the shares were registered in his name until converted. No prospectus, financial statement or brochure of company information had been shown to Mrs. Cola. Only an Interamerica calendar with Terzano's card attached was produced as to the authenticity of the company and the subject transaction. The card indicated that Terzano was a manager for Interamerica.
Mrs. Cola had never owned or been involved in the purchase of any corporate stock, public or private, and was totally unfamiliar with such sophisticated investments. In March 1972 she sought the assistance of counsel for collection purposes. It was then that she first learned of the legal *53 significance and speculative nature of the January 1971 transaction.
The sale of corporate stock and securities is a sophisticated business which requires regulation in the public interest. Those who deal in these transactions must be held to high standards. Higgins v. N.J. Bureau of Securities, 100 N.J. Super. 266 (App. Div. 1968). The Securities Laws were intended to protect the uninitiated and to prevent frauds on the public at large. Stevens v. Liberty Packing Corporation, 111 N.J. Eq. 61 (Ch. 1932). Historically, the Securities Act was purely preventative and not redressive. Its sanctions were imposed only through the criminal courts. Stevens v. Home Brewery, Inc., 112 N.J. Eq. 513, 517 (Ch. 1933).
In 1960 New Jersey provided for civil actions in connection with the sale of securities.[1] In the 1967 amendments the Legislature added a fourth basis upon which to predicate civil liability.[2] This section reads:
(a) Any person who (1) offers or sells a security in violation of sections 8(b) (unlawful representation concerning registration), 9(a) (broker dealers, agent or investment advisor; registration requirement), or 13 (registration of securities; requirement) of this act ... is liable to the person buying the security from him, who may sue to recover the consideration paid for the security, together with interest at 6% per year from the date of payment and costs, less the amount of any income received on the security, upon the tender of the security and any income received on it, or for damages if he no longer owns the security.
N.J.S.A. 49:3-71(b) provides:
(b) Every person who directly or indirectly controls a seller liable under paragraph (a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the *54 sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable.
The language of this 1967 amendment is clear that liability attaches "by operation of law" to the sale by any person of any nonexempt, unregistered security. N.J.S.A. 49:3-71; N.J.S.A. 49:3-60; see also, State v. West, 29 N.J. 327, 331 (1959); 96 N.J.L.J. 305, 324. Cf. Data Access Systems, Inc. v. State, 63 N.J. 158, 163 (1973); In re Information Resources, 126 N.J. Super. 42 (App. Div. 1973). With regard to the liability of "non-sellers," such as officers, directors and "control persons," other jurisdictions have interpreted statutes similar to N.J.S.A. 49:3-71(b) and have based liability on minimal participation in the sale. Moerman v. Zipco, Inc., 302 F. Supp. 439 (D.E.D.N.Y. 1969), aff'd 422 F.2d 871 (2 Cir.1970); Goelitz v. Lathrop, 286 Ill. App. 248, 3 N.E.2d 305 (App. Ct. 1936). Abrams v. Love, 254 Ill. App. 428 (App. Ct. 1928); see generally, 44 A.L.R.3d 588. Guidance from these and other sister state decisions in this area is particularly appropriate. These decisions should be followed, especially where, as here, the purpose of the Uniform Securities Law, insofar as adopted by N.J.S.A. 49:3-47 et seq., is to promote uniformity and standardization of transactions thereunder. State v. Russell, 119 N.J. Super. 344, 350 (App. Div. 1972); State v. Weissman, 73 N.J. Super. 274, 281 (App. Div. 1962); see also, 2 Sutherland Statutory Construction (3d ed. Horack 1943), § 5211 at 557 (similar construction to be given to comparable statutes).
Kneeland v. Emerton, 280 Mass. 371, 183 N.E. 155 (Sup. Jud. Ct. Mass. 1932), was the first decision in Massachusetts under its Sale of Securities Act. In that case plaintiff sued to recover the purchase price of stock based on the seller's *55 failure to comply with statutory requirements similar to our registration requirements. The court held that the seller's failure to comply with the securities laws justified rescission by the buyer. This civil remedy is also available for other violations of the Massachusetts Securities Laws. See Giordano v. Auditore, 355 Mass. 254, 244 N.E.2d 555 (Sup. Jud. Ct. 1968).
In Moerman v. Zipco, supra, the purchaser alleged violations of the Federal securities laws and Connecticut Blue Laws. The court gave judgment for the plaintiff and allowed for the recovery of the purchase price with interest, plus costs and attorney's fees. The court said:
The only facts necessary to establish liablity under the Connecticut statute are that stock was sold, and that it was not registered. * * * [302 F. Supp. at 440]
On rehearing, 430 F.2d 362 (2 Cir.1970), the court held that ignorance of the Connecticut statute was no defense. The statute provided for recovery of the purchase price plus interest from:
* * * every person who directly or indirectly controls a seller liable under subsection (a) of this section every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale and every broker or dealer or salesman who materially aids in the sale shall be liable jointly and severally with and to the same extent as the seller * * * if the person charged thereunder knew or could have reasonably determined that the securities had not been registered. * * * [at 363]
The court notes the similarity of N.J.S.A. 49:3-71(b) to the Connecticut statute.
In Richardson v. MacArthur, 451 F.2d 35 (10 Cir.1971), the court found a corporation liable as a "controlling person" within § 20(a) of the Security Exchange Act of 1934. The court said:
*56 Liability under § 20(a) is not restricted by principles of agency or conspiracy. The statute is remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a controlling person liable.
See Myzel v. Fields, 386 F.2d 718 (8 Cir.1967) cert. den. 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), and Moerman v. Zipco, Inc., supra.
The corporation was liable in Richardson v. MacArthur, supra, because it had selected the seller to develop the corporation in another state, to handle its affairs within that state, and had regularly received reports from him as to his corporate dealings in that state.
The court again notes the similarities of N.J.S.A. 49:3-71(b) to the statute construed.
In Miller v. Griffith, 196 N.E.2d 154 (Ohio Sup. Ct. 1961), the purchaser of stock brought an action for the purchase price against officers of a corporation on the grounds of Securities Act violations. The court noted that the burden of proving that the securities were exempt from registration was on the corporation and that the failure to register the stock or obtain an exemption gave rise to an action for the price not only against the corporation but also against every officer or person who participated in the sale in any way. The court held the corporation's president, who did not directly participate in the sale but who had signed the stock certificates, liable to return the purchase price of the stock because of the violation of the Securities Act. See also, Arnold v. Mixon, 194 S.E.2d 307 (Ga. Ct. App. 1972).
In Young v. Kwock, 474 P.2d 285 (Hawaii Sup. Ct. 1970), the purchasers of unregistered notes sold in violation of state "Blue Sky" laws, brought an action against several officers of the selling corporation to rescind the sale. The court said that when unregistered securities are sold in violation of securities law, the "seller" is automatically liable in statutory rescission. It said that this remedy extends to *57 officers, directors and agents who aid or participate in the unlawful sale. They are charged with knowledge of "Blue Sky" registration requirements and are liable in rescission for any contribution or knowledgeable assistance in the distribution of unregistered securities.
It is clear from the foregoing authority that liability attaches by operation of law to sales of securities transacted in violation of state securities laws. N.J.S.A. 49:3-60 and portions of the New Jersey Administrative Code[3] require prior registration of nonexempt securities. There is ample evidence in this case demonstrating that the stock was unregistered. No proof was offered as to the availability of any exemption under N.J.S.A. 49:3-60 or 49:3-50. Consequently, the court finds the sale of this stock violated the above statutory provisions and gives rise to an action for rescission against all those who participated in the sale; N.J.S.A. 49:3-71. Miller v. Griffith, supra; Young v. Kwock, supra.
There can be no doubt as to Terzano's liability under N.J.S.A. 49:3-70(a). He was the actual seller who negotiated with Mrs. Cola, made the representations in question, and participated in the actual transfer of funds from Mrs. Cola to I.I.S. During the first quarter of 1971 sales of I.I.S. stock had reached the $200,000 level. Terzano himself had invested $1,000 in I.I.S. stock in July of 1970. He was also generally familiar with the fact that unregistered stock was restricted to certain investors although he denied familiarity and training in "private placement" stock sales and denied familiarity with "fending capability." It is significant that Terzano, as a manager, had five or six persons as salesmen under him. He attended meetings of managers at which Carvel Klee presided, received bulletins which discussed in great detail the different investment possibilities they should pursue and sell, including the very stock which he sold to *58 Mrs. Cola. It is also admitted that he had not revealed to Mrs. Cola the fact that any dividends to be paid by the corporation were conditioned on the board of directors declaring such dividends, nor did he tell her that the stock was restricted as to sale and distribution and could not be transferred or disposed of without an opinion of counsel.[4]
Sidney Packer, who was on the same level as Terzano, was a managing agent in Clifton, New Jersey. He too received bulletins, attended sales meetings and had men working under him. Testimony also reveals that Packer purchased large quantities of I.I.S. stock and sold large quantities to his relatives. His letter acknowledging the purchase and his being the nominee of Mrs. Cola's stock warrants a similar finding against him. Miller v. Griffith, supra; Young v. Kwock, supra.
Carvel Klee, the resident vice-president of I.I.S., was the person to whom all checks and payments were sent. He was formally associated with Investors Planning Corp. and was familiar with the securities laws since at one time he was licensed to sell stock. Klee became associated with Interamerica in January 1969, after leaving a manager's position in the New Jersey branch of Wadell & Reed, a broker-dealer in mutual funds.
In April 1970, when all shares of Interamerica were exchanged for shares of I.I.S., he became a director of Interamerica. Thomas Lehe then became president of both corporations. Klee knew Lehe from Wadell & Reed, and through *59 discussions with Lehe and Morris Forer he helped set up I.I.S. and devise the nominee distribution system of I.I.S. shares throughout the nation. Forer was corporate counsel to Lehe and a former director of I.I.S. He expressed his concern with the requirements of various "Blue Sky" and federal securities laws. He sent numerous letters to Lehe in this regard and discussed these problems with Lehe and Klee. Additionally, there is ample testimony supporting this court's finding that each was aware that the sale of I.I.S. stock was not a purely intrastate offering, to persons who could "fend" for themselves or to persons possessed with requisite skills in securities investments. Specifically, the court finds that Klee, like Packer, was a nominee and held shares of stock for the benefit of more than 20 non-resident purchasers. Furthermore, the stock sold was restricted as to resale and was so stamped.
In summary, the evidence is abundantly clear that these officers and directors were aware of the potential violations of "Blue Sky" laws and yet failed to effectively comply with the statutes. Under these circumstances the court charges Klee and Lehe, as the president of I.I.S. and Interamerica, with knowledge and violations of N.J.S.A. 49:3-71(b). State v. Russell, 119 N.J. Super. 344, 351 (App. Div. 1972); Cf. Budelman v. White's Exp. & Transfer Co., 49 N.J. Super. 511 (App. Div. 1958); Abeles v. Adams Engineering Co., 64 N.J. Super. 167 (App. Div. 1961), mod. 35 N.J. 411; Singer Mfg. Co. v. Sun Vacuum Stores, Inc., 192 F. Supp. 738 (D.C.N.J. 1961); K & J. Clayton Holding Corp. v. Keuffel & Esser, 113 N.J. Super. 50 (Ch. Div. 1971); see also, Miller v. Griffith, supra, and Young v. Kwock, supra; and Smith v. Crawford, 288 Ky. 420, 15 S.W.2d 249 (Ct. App. 1929); Chamber v. Beckwith, 247 Mich. 255, 225 N.W. 605 (Sup. Ct. 1925); McWhirter v. Holmes, 49 Ga. App. 536, 176 S.E. 153 (App. Ct. 1934); Mary Pickford Co. v. Bayly Bros., 68 P.2d 239, (Cal. D. Ct. App. 1937), mod. 12 Cal.2d 501, 86 P.2d 102 (Sup. Ct. 1939); Strahan *60 v. Rodney, 97 Cal. App.2d 448, 217 P.2d 711 (D. Ct. App. 1950); Perkins v. Dole, 240 Ill. App. 20 (App. Ct. 1926); Cleland v. Smart, 321 Mich. 46, 32 N.W.2d 42 (Sup. Ct. 1948); Ferar v. Hall, 330 Mich. 214, 47 N.W.2d 79 (Sup. Ct. 1951).
There are also allegations of fraud and deceit in this case. The court finds that the essential element of scienter on the part of Terzano is lacking. His representations as to the financial position of I.I.S. and Interamerica were not proved to be made with knowledge of their falsity. His testimony was, to his knowledge (and he had no reason to believe otherwise), that the corporations were exceedingly prosperous. However, there is no doubt that his representations as to corporate worth, the "guarantee" of 9% interest and the assurance of the return of capital, induced Mrs. Cola into a transaction into which she would not have entered except for her misapprehension as to its basic nature. She expended $15,000 understanding it to be a loan and consequently lost at least the going commercial interest rate on her money. These circumstances also entitled plaintiff to rescind the transaction on the basis of equitable fraud. See Foont-Freedenfeld v. Electro-Protective, 126 N.J. Super. 254 (App. Div. 1973). Marx v. Jaffe, 92 N.J. Super. 143, 147 (App. Div. 1966), certif. den. 48 N.J. 140 (1966); Merchants Ind. Corp. v. Eggleston, 37 N.J. 114, 130 (1962). See also Prosser, Torts (3d ed. 1964), § 100, and Restatement, Restitution, § 28, wherein fraud is treated with mistake.
There will be judgment in favor of Mrs. Cola for the purchase price of the stock with interest running from the date of payment plus costs. The relief on the cross-claims is denied. See Young v. Kwock, supra. In view of the fact that Mrs. Cola has received no return on her investment, has been unable to recoup her principal and was compelled to retain counsel to pursue the matter in court, an award of a counsel fee of $1,000 is warranted. See Moerman v. Zipco, supra.
NOTES
[1] N.J.S.A. 49:3-19
[2] N.J.S.A. 49:3-71
[3] See N.J.A.C. 13:13-9.14; 13:13-10; 13:13-11.20; 13:13-15 (Bureau of Securities).
[4] The following legend was stamped in the upper left-hand corner of the stock certificate issued to Sidney Packer to be held by him for Mrs. Cola:

"The shares represented by this certificate have not been registered under the Securities Act of 1933. The shares represented by this certificate have been taken by the registered owner for investment, and without a view to resale or distribution thereof, and may not be transferred or disposed of without an opinion of counsel satisfactory to the issuer that such transfer or disposition does not violate the Securities Act of 1933, as amended, or the rules and regulations thereunder."