Jan H. GAUDINA, Appellant
(Defendant),

v.

Richard F. HABERMAN and Nellie
Haberman, Appellees (Plaintiffs).

No. 5581.

Supreme Court of Wyoming.

April 16, 1982.

George L. Simonton of Simonton & Simonton, Cody, signed the brief and appeared in oral argument on behalf of appellant.

Fredric B. Butler, Vail, Colo., signed the brief and appeared in oral argument on behalf of appellees.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

RAPER, Justice.

The district judge, following a nonjury trial, entered a joint and several judgment in favor of plaintiffs-appellees Habermans against the defendants (Heritage) (Bromley) (Gaudina). The judgment awarded damages of $54,591.48 and interest computed at the rate of 6% per annum for the period of time from September 26, 1973 to February 25, 1981—this amounted to $24,281.49. The total award was shown as $78,873.27; however our computation indicates that it should have been for $78,872.97—there was a minor 30¢ error.[1] In his Find-

---

1. We have previously had this case before us. *Bromley v. Haberman*, Wyo., 583 P.2d 703 (1978). In that appeal we set aside a default judgment which had been entered against Bromley and Gaudina.

ings, the trial judge based recovery on the standards of duty set out in the provisions of the Uniform Securities Act of the State of Wyoming, § 17–117.1, et seq., W.S.1957, as amended (now § 17–4–101, W.S.1977, et seq.). Only Gaudina has perfected an appeal.[2] He raises as issues:

"1. Did the transaction between Heritage Trust Company and Habermans involve a 'security?' If so, was it exempt under W.S. 17–117.14(a)(3) [W.S.1957]? [Now § 17–4–114(a)(iii).[3]]

"2. Did Gaudina sustain the burden of proof that he did not know, in the exercise of reasonable care, of the untruth or omission of material facts?

"3. Did the Court properly set off the value of the property still held by Habermans in the award of judgment?

"4. Was there sufficient evidence to support the Judgment against Gaudina?

"5. Did the District Court abuse its discretion in failing to dismiss the Complaint pursuant to Gaudina's Motion to Dismiss after the first appeal was remanded?"

We will affirm except direct reduction of the judgment by $1,000.00.

Heritage was a corporation organized under the laws of Arizona to engage in the trust business in that state. Bromley was its principal officer, holding a controlling interest and directing its extensive operations. Gaudina was engaged on a commission basis by Bromley to sell its trust instruments in Wyoming.

Gaudina was a Colorado resident with a sales background in movie cameras, vacuum cleaners and insurance. He had two years of college business training. Any knowledge of trusts which he had was gathered during his experience as an insurance salesman and at seminars and conferences in connection with estate planning instruction. Through friends, he came into contact with Heritage and was employed by that company in April 1973. He was furnished with various sales materials and business cards showing him to be a "trust consultant."

Gaudina's father had been in the business of selling insurance and mutual funds out of Billings, Montana, but died in 1972. His territory had extended into Wyoming. Gaudina "inherited" all of his father's business records which included a "black book" which contained the names of various Wyoming customers, prospects and contacts. With the aid of the little black book, he began contacting various persons in Wyoming there named. Included were the Habermans, who he contacted and offered the services of Heritage. They had purchased mutual funds from Gaudina's father or his associate, a Ted Schuman.

In his sales pitch to the Habermans he represented that if they placed their money into a trust account with Heritage, it would be invested in top quality—first quality—high quality investments, such as loans to third parties secured to the extent of 125% by first mortgages on real estate and that they would receive 14% interest in return. Gaudina readily admitted that he had so represented but he took the position that this was the information he had been given by Bromley and that he did not know the information to be false.

In addition, he left various printed materials with the Habermans, some in elaborate format which glowingly set out the "IMPORTANT BENEFITS YOU ENJOY

---

**2.** Heritage did not file a notice of appeal. Bromley filed his notice of appeal late so this court, on its own motion, dismissed the appeal for that reason. Rule 2.01, W.R.A.P.

**3.** Section 17–117.14(a)(3), W.S.1957, C.1965 (now § 17–4–114(a)(iii), W.S.1977):

"(a) The following securities are exempted from sections 7 and 15 [§§ 17–117.7 and 17–117.15]:

\*    \*    \*    \*    \*    \*

"(3) any security issued by a state or national bank or trust company authorized to do business in the state."

In 1975, effective in late May, 1975, ch. 66, S.L.Wyo.1975, the words "or trust company" were deleted from the Uniform Securities Act first adopted in 1965. Ch. 160, S.L.Wyo.1965. We will deal with this statute in Part I of this opinion.

In that this cause arose prior to republication of the Wyoming Statutes in 1977, we will cite both the 1957 statutes, C.1965 and the 1977 statutes.

WHEN YOU CREATE A LIVING TRUST WITH HERITAGE TRUST COMPANY" by which "We design, install and take full responsibility for the administration of each plan and trust." It was lavish in emphasizing:

"1. You add a margin of safety and protection for your investment because, as your trustee, Heritage Trust Company is responsible to you and the banking authorities who regulate us.

"2. Heritage Trust Company is licensed under the State of Arizona Banking Department, and, as such, conducts itself in the same manner as banks who maintain trust activities, and our *only* business is Trust.

"3. We have F.D.I.C. protection on cash in our depositary bank (Arizona Bank).

"4. We have a million dollar fidelity bond on each employee.

"5. We have liability, and errors and omissions insurance.

"6. We are regularly examined by the State of Arizona bank examiners." (Emphasis in original.)

The biography of Bromley, the company's leader, which was included in the sales material and brochures set out an extensive and impressive banking and trust experience.

The Habermans warmed up to all this exposure. Having been persuaded, on September 26, 1973, they eagerly executed and delivered to Gaudina an impressive-appearing document entitled "REVOCABLE DECLARATION OF TRUST." This form had been provided by Heritage and was referred to as an "inter vivos trust." They concurrently paid over to Gaudina $18,615.00 by check payable to Heritage Trust Company. They also, at a later time, transferred stock valued at about $36,000.00 to Heritage for their trust account. The last of the stock transfers was in November 1973. The Habermans received Heritage Trust receipts in acknowledgment of these deposits.

The bubble began to rupture on December 9, 1974, when the Secretary of State for Wyoming issued and served a Cease and Desist Order upon Heritage Trust and Gaudina ordering them to immediately discontinue the offer and sale of securities of Heritage until they conformed to the requirements of the Wyoming Uniform Securities Act.[4] As pointed out by the trial judge in his Findings and Conclusions, this action was filed in 1975 and it "has ebbed and flowed in the backwaters of judicial administration and the shelves and files of attorney's offices for more than 5 years and 5 months" at the district court level. We would add that the record presented a paper chase down a tortuous path with obstacles thrown up at every turn by the defendants.

The trial judge found, amongst other things, that the trust contracts were "securities" within the meaning of Wyoming's Uniform Securities Act[5] and were not "exempted securities"; that Gaudina was an

---

4. The Cease and Desist Order contained as findings:

"(1) Heritage Trust Company is an Arizona corporation incorporated on April 27, 1960;

"(2) The operations of Heritage Trust Company in Wyoming do not fall within the exemption afforded trust companies by Section 14(a)(3) of the Wyoming Uniform Securities Act;

"(3) The securities of Heritage Trust Company are not registered in Wyoming as required by the Wyoming Uniform Securities Act;

"(4) Heritage Trust Company was the subject of a complaint by the Securities and Exchange Commission alleging the sale of unregistered securities and fraud in the sale of securities;

"(5) Jan Gaudina has made offers to and has sold to certain Wyoming residents the securities of Heritage Trust Company;

"(6) Jan Gaudina is not an agent authorized under the Wyoming Uniform Securities Act to offer and sell securities in Wyoming."

See *Securities and Exchange Commission v. Heritage Trust Company*, 402 F.Supp. 744 (D.Ariz.1975) for a history of Heritage in its bilking of unsophisticated investors.

5. Section 17-117.13(k), W.S.1957, C.1965, now § 17-4-113(xi), W.S.1977:

"(k) 'Security' means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting-trust certificate;

agent of Heritage and Bromley, with Bromley the sole shareholder, owner and person in control of Heritage; that neither Gaudina nor Bromley were registered as agents [6] as required by the Wyoming Uniform Securities Act; that while neither Bromley or Gaudina committed common law fraud or conversion; "[t]he defendants have specifically violated the provisions of § 17.117.1 now § 17–4–101, W.S.; § 17.117.3 now [§] 17–4–103; and § 17.117.22 now § 17–4–112 [sic, should be 17–4–122], W.S." [7]

certificate of deposit for a security or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. 'Security' does not include any insurance or endowment policy or annuity contract under which an insurance company promises to pay money either in a lump sum or periodically for life or for some other specified period."

6. Section 17–117.13(b), W.S.1957, C.1965, now § 17–4–113(ii), W.S.1977:

"(b) 'Agent' means any individual other than a broker-dealer who represents a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities. 'Agent' does not include an individual who represents an issuer in (1) effecting transactions in a security exempted by clause (1), (2), (3), or (10) of section 14(a) [§ 17–117.-14(a)], (2) effecting transactions exempted by section 14(b) [§ 17–117.14(b)], or (3) effecting transactions with existing employees, partners or directors of the issuer if no commission or other remuneration is paid or given directly or indirectly for soliciting any person in this state. A partner, officer, or director of a broker-dealer or issuer, or a person occupying a similar status or performing similar functions, is an agent only if he otherwise comes within this definition."

A 1975 amendment inserted the reference to clause (9) of § 17–117.14(a) in the second sentence and substituted "W.S. 17–117.14" for "section 14" twice in that sentence.

7. Section 17–117.1, W.S.1957, C.1965, now § 17–4–101, W.S.1977:

"It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

"(1) to employ any device, scheme, or artifice to defraud,

"(2) to make any untrue statement or [of] a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or

"(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

Section 17–117.3, W.S.1957, C.1965, now § 17–4–103, W.S.1977:

"(a) *Registration required.*—It is unlawful for any person to transact business in this state as a broker-dealer or agent unless he is registered under this act [§§ 17–117.1 to 17–117.29].

"(b) *Agent's registration.*—It is unlawful for any broker-dealer or issuer to employ an agent unless the agent is registered. The registration of an agent is not effective during any period when he is not associated with a particular broker-dealer registered under this act or a particular issuer. When an agent begins or terminates a connection with a broker-dealer or issuer, or begins or terminates those activities which make him an agent, the agent as well as the broker-dealer or issuer shall promptly notify the secretary of state.

"(c) *Expiration of registration.*—Every registration expires one year from its effective date unless renewed."

Section 17–117.22, W.S.1957, C.1965, now § 17–4–122, W.S.1977:

"(a) *Generally.*—Any person who

"(1) offers or sells a security in violation of section 3(a), 7, or 17(b) [§ 17–117.3(a), § 17–117.7 or § 17–117.17(b)] *or* of any rule or order under section 15 [§ 17–117.15] which requires the affirmative approval of sales literature before it is used, *or* of any condition imposed under section 10(d), 11(g), or 11(h) [§ 17–117.10(d), § 17–117.11(g) or § 17–117.11(h)], *or* [Emphasis added]

"(2) offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission,

("is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and

The trial judge went on to find and conclude that Gaudina in connection with the sale of securities to the Habermans "made untrue statements of material facts, although he did not know they were untrue at the time, but he did fail to state material facts with reference to the sale of the securities so as to make the totality of the statements made at that time misleading to the plaintiffs"; and that "Gaudina did not sustain the burden of proof that he did not know in the exercise of reasonable care of the untruth or omission of facts to the plaintiffs and Bromley, acting through his 'agent' Gaudina, is liable to the plaintiffs for the reason that he cannot hide behind the acts or omissions of Gaudina in this instance."

We will add to this scenario as we pick our way through the issues.

## I

■■ There is no doubt that the investment document was a security. As explained in *Securities and Exchange Commission v. Heritage Trust Company,* supra fn. 4, in the late 1960's and early 1970's notes and mortgages taken by promoters in the sale of Arizona lots at high prices were peddled to unsuspecting and unworldly buyers. They were declared nonexempt securities early in the 1970's. Bromley contrived the "inter vivos trust" document as a device to obtain funds which he in turn used to purchase such notes and mortgages. It was only a scheme to do indirectly what could not be done directly. Blue sky laws have as their primary purpose the suppression of fraudulent practices and the protection of the public from their own gullibility. *Lolkus v. Vander Wilt,* 258 Iowa 1074, 141 N.W.2d 600 (1966).

Included in the exhibits is the Second Account and Report of the Receiver appointed by the Supreme Court of Arizona to take possession of the assets of the Heritage Trust Company, which set out how Bromley "invested" the money of trustors such as the Habermans. It was a devilish scheme that expanded into not only Arizona but also Indiana, Mexico, Minnesota, Missouri, New Mexico, South Carolina, Texas, and probably other places. What is referred to as the Southwest Venture is particularly interesting and demonstrates the Heritage operation, as described by the Receiver:

"This 'wraparound' transaction occurred on February 27, 1974 and involved a series of sales of a parcel of property known as the W. G. Sawyer Tract located in Fort Bend County, Texas. The subject property was originally owned by one W. G. Sawyer, who sold his interests to John M. Stevenson, Jr., Trustee, for the sum of $811,543.34. Mr. Stevenson then immediately resold the same property to REACT Corporation, a Texas corporation, for $899,216.00. REACT Corporation in turn sold the property on the same date to Southwest Venture, a joint venture, acting through its managing venturers John M. Stevenson, Jr. and Leslie P. Saunders, and received a promissory note for the sales price of $1,116,000.00. REACT Corporation subsequently assigned and endorsed the promissory note payable to the order of Heritage Trust Company, as Trustee for the benefit of trustors whose funds contributed toward this investment.

"To finance this transaction, for payment of 'fees', 'commissions', 'bonuses', and incidental expenses, Heritage Trust Company extracted from certain trusts the total of $231,250.00. In keeping with its customary practice, Heritage then retained from this sum a 20% 'commission', which in this instance totaled $46,250.00. The

interest at six percent per year from the date of disposition.) [Parentheses added. Though the Wyoming statute shows the parenthetical material as part of (2), it is a part of (a) of this section, having been improperly formated from the Uniform Securities Act. Section 410, Uniform Securities Act, 7A U.L.A. p. 670.]

\* \* \* \* \* \*
"(h) *Rights and remedies cumulative.*—The rights and remedies provided by this act are in addition to any other rights or remedies that may exist at law or in equity, but this act does not create any cause of action not specified in this section or section 4(e) [§ 17–117.4(e) ]."

remaining $185,000.00 was forwarded to Houston to finance the necessary expenses. The records of Heritage Trust Company indicate that a portion of this amount was distributed from escrow as follows:

| "Payee and Purpose | Amount |
|---|---|
| "Heritage Trust Company (Prepaid Interest) | $37,000.00 |
| REACT Corporation (Commission) | $21,175.00 |
| REACCO Corporation (Commission) | $31,762.00 |
| Abraxas Land Corporation (Real estate commission) | $54,883.00 |
| Pickfair Corporation (Purpose unknown) | $ 7,562.50 |
| Rosenberg Abstract Company (Survey) | $ 2,394.56 |
| Stewart Title Company (Closing fees) | $ 1,056.24" |

No payments were ever made on the promissory note, and Heritage was unable to pay the underlying lienholder, Sawyer, with a first mortgage; so he foreclosed. There was, as usual, nothing left for the trust. Many of such transactions appear in the Receiver's report. Repeatedly, REACT or another company by the name of REACCO was a party—sometimes both—to the "wrap-around" sales. Heritage was taking second and third mortgages to secure its financial participation in such transactions, using the trustor's money including that invested by the Habermans, skimming off a twenty percent fee for itself—actually Bromley.

Section 17–117.13(k), W.S.1957, C.1965, now § 17–4–113(xi), W.S.1977, fn. 5, defining securities is identical for our purposes to 15 U.S.C. 77b(1), § 2(1) of the Securities Act of 1933.[8] The United States District Court in *Securities and Exchange Commission v. Heritage Trust Company,* supra fn. 4, held the "inter vivos trust" agreements to be securities, relying on *Securities and Exchange Commission v. Glenn W. Turner, Enterprises, Inc.,* 474 F.2d 476 (9th Cir. 1973), cert. denied 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53, wherein it was said:

"The 1933 and 1934 Acts are remedial legislation among the central purposes of which is full and fair disclosure relative to the issuance of securities, *SEC v. W. J. Howey Co.,* 1946, 328 U.S. 293, 299, 66 S.Ct. 1100, 90 L.Ed. 1244; *Tcherepnin v. Knight,* 1967, 389 U.S. 332, 337, 88 S.Ct. 548, 19 L.Ed.2d 564. It is a familiar canon of legislative construction that remedial legislation should be construed broadly, *Tcherepnin v. Knight,* supra, 389 U.S. at 337, 88 S.Ct. 548 [at 553]. The Acts were designed to protect the American public from speculative or fraudulent schemes of promoters. For that reason Congress defined the term 'security' broadly, and the Supreme Court in turn has construed the definition liberally. In *SEC v. Joiner Corp.,* 1943, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88, the Court stated: 'However, the reach of the Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as "investment contracts," or as "any interest or instrument commonly known as a 'security'".' 320 U.S., Id. at 351, 64 S.Ct. at 123. In *SEC v. W. J. Howey Co.,* supra, the Court stated that the definition of a security 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.' 328 U.S. Id. at 299, 66 S.Ct. at 1103. And in the recent case of *Tcherepnin v. Knight,* supra, the Court stated, '[I]n searching for the meaning and scope of the word "security" in the Act, form should be disregarded for substance and the emphasis should be on economic reality.' Id. at 336, 88 S.Ct. at 553. * * *" (Footnotes omitted.) 474 F.2d at 480–481.

See in addition, *Melton v. Unterreiner,* 575 F.2d 204 (8th Cir. 1978) also involving Heritage against another of its agents. The

---

8. The Wyoming section differs in that it does not include "fractional undivided interest in oil, gas or other mineral rights," as found in 15 U.S.C. 77b(1), nor is there any reference to insurance.

Uniform Securities Act has been interpreted in the same light. *Department of Commerce v. DeBeers Diamond Investment Ltd.*, 89 Mich.App. 406, 280 N.W.2d 547 (1979); *Sauve v. K.C., Inc.,* 91 Wash.2d 698, 591 P.2d 1207 (1979).

Gaudina claims that it was not determined until 1975 when *Securities and Exchange Commission v. Heritage Trust Company,* supra, was decided that these particular "inter vivos trust" documents were declared securities. However it was long the law, set out in *Securities and Exchange Commission v. W. J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244, 163 A.L.R. 1043 (1946), cited by the court in *Securities and Exchange Commission v. Heritage Trust Company,* supra, and *Melton v. Unterreiner,* supra, that the test for determining whether an agreement was an "investment contract" under the statute is found within the following definition:

"* * * [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party * * *." 328 U.S. at 298–299, 66 S.Ct. at 1103.[9]

That definition fits the "inter vivos trust" agreement here like a glove. This criteria has been adopted by states for application to the same term appearing in § 401 of the Uniform Securities Act, (§ 17–117.13(k), W.S.1957, C.1965, now § 17–4–113(xi), W.S. 1977) supra, fn. 5. *State v. Duncan,* Mont., 593 P.2d 1026 (1979); *Department of Commerce v. DeBeers Diamond Investment,* supra. *State, Commissioner of Securities v. Hawaii Market Center,* 52 Hawaii 642, 485 P.2d 105, 47 A.L.R.3d 1366 (1971) applies the rule even more broadly. *Sauve v. K. C., Inc.,* supra; *AMR Realty v. State Bureau of Securities,* 149 N.J.Super. 329, 373 A.2d 1002 (1977).

In *Marshall v. Harris,* 276 Or. 447, 555 P.2d 756 (1976) it was held that an agreement purchasing an interest in two race horses was an "investment contract" and the transaction was a sale of a security under the Oregon Securities Law; the *Howey* definition which we adopt was approved. The person making the sale was not the owner of the horses. The court there stated that knowledge by the person making the sale that there was a violation was not a necessary element of liability because otherwise evasion of the statute would be easily accomplished and thereby deprive it of much of its effect. Referring to other Oregon authority, it quoted, there is "a class of gentlemen * * * [who] 'toil not neither do they spin'" but who "lie awake nights endeavoring to conceive some devious and shadowy way of evading the law." The aim the court pointed out is to construe the securities law liberally so as to afford the greatest possible protection to the public.

■ When Gaudina or any other person undertakes to sell an investment, he is obligated to know the law surrounding such transactions and what is and what is not a security. It has long been a basic precept that ignorance of the law is no excuse. It would be impossible to administer the securities act if ignorance of its requirements and the surrounding case law were a defense. *Utermehle v. Norment,* 197 U.S. 40, 55, 25 S.Ct. 291, 296, 49 L.Ed. 655, 661 (1905).

■ Gaudina claims that the securities of the Heritage Trust Company are exempt in that it is a trust company within the purview of § 17–117.14(a)(3), W.S.1957, C.1965, now § 17–4–114(a)(iii), W.S.1977, as it existed prior to amendment in 1975, fn. 3:

"(a) The following securities are exempted from sections 7 and 15 [§§ 17–117.7 and 17–117.15]:

*     *     *     *     *     *

"(3) any security issued by a state or national bank or trust company authorized to do business in the state."

The language of the original act, as adopted in 1965 and in effect until 1975 when only

---

**9.** The United States Supreme Court on March 8, 1982, in *Marine Bank v. Weaver,* —— U.S. ——, 102 S.Ct. 1220, 71 L.Ed.2d 409, confirmed this test as the continuing criteria.

the words "or trust company" were removed, is different from § 402(a)(3) of the Uniform Securities Act, 7A ULA 638, the source, which exempts:

"(3) [any security issued by] *and representing an interest in or a debt of, or guaranteed by, any* bank *organized under the laws of the United States, or any* [a state or national] bank, *savings institution,* or trust company *organized and supervised under the laws of any* [authorized to do business in the state]." (Emphasis added to words in the Uniform Act not in the Wyoming Act. Bracketed words appear in the Wyoming Act.)

By changing the words "any state" to "the state," a legislative intent was manifested to confine the section to trust companies authorized to do business *in the state* of Wyoming. By changing the language of the uniform act there is an analogy to what this court has articulated on several occasions with respect to legislative amendment of an existing statute. In such case, it is presumed that a change was intended. *State ex rel. Albany County Weed and Pest District v. Board of County Commissioners of County of Albany,* Wyo., 592 P.2d 1154 (1979). We endeavor to make such change effective. *Brown v. State,* Wyo., 590 P.2d 1312 (1979). The change is therefore that for application of the exemption, banks and trust companies must be authorized to do business in the state of Wyoming.

The transactions in question took place September through November, 1973, prior to issuance by the Secretary of State of a certificate of authority issued to Heritage on June 26, 1974, "pursuant to the provisions of the Wyoming Business Corporation Act."[10] The conclusion must be that the securities of Heritage were not authorized for sale as exempt under the laws of Wyoming at the time of these transactions.[11]

█ We will go on to add that the name Heritage Trust Company alone does not qualify the company as a trust company exempt under § 17–117.14(a)(3), W.S.1957, C.1965 before amendment by § 1, ch. 66, S.L.Wyo.1975, which eliminated the securities of a trust company as exempt. The term trust company is not defined by the Uniform Securities Act.[12] We can only conclude that it refers to the type of trust company authorized by § 13–5–101, et seq., W.S.1977. We see no authority of a trust company to issue securities such as the "inter vivos trust" document issued here.

█ Inherent in the definition of a trust company is the fact that there are well defined fiduciary duties which must be performed in the administration of a trust. The so-called trust document here provides that the trustee, Heritage, "shall have the full power in its absolute discretion * * * (a) to sell, redeem, transfer, exchange, invest or reinvest any property belonging to the Trust Estate *irrespective of any rule of law governing investments by fiduciaries*"! (Emphasis added.) It is apparent that Heritage, in selling these "trusts" with the exclusion of any fiduciary duties, could not qualify as a trust company under the trust company[13] laws of this state. It is unthink-

10. It seems unusual that trust companies organized under the laws of another state are not under the supervision of and examination by the state examiner, as are trust companies organized under the laws of this state. Section 13–5–101, et seq., W.S.1977.

11. However that may be, exempted trust companies are not exempted from the anti-fraud provision of § 17–117.1, W.S.1957, C.1965, now § 17–4–101, W.S.1977, fn. 7, and the civil liabilities imposed by § 17–117.22, W.S.1957, C.1965, now § 17–4–122, W.S.1977, fn. 7. See, Commissioners' Note to § 402, Uniform Securities Act of 1956, 7A ULA 643.

12. We would have no problem with this designation if the legislature in adopting the Uniform Securities Act had not modified the language of 402(a)(3) of the Uniform Securities Act of 1956, fn. 3. By that language the true intent of the provision was that the subsection applied only if the security represents an interest in or a debt of the particular issuer, or is guaranteed by the particular issuer. Heritage clearly did not do that. This exemplifies the dangers of altering uniform acts, though at least for the purposes of this case, it worked out because only the securities of trust companies authorized to do business in this state were exempt.

13. Section 13–5–101(b)(i), W.S.1977:

able that a trustee not have the obligations of a fiduciary. See Uniform Fiduciaries Act; § 4–1–101, et seq., W.S.1977. A trustee cannot by agreement escape the fiduciary obligations of a trustee under Wyoming statutory provisions. Heritage was therefore not a bona fide trust company.

## II

It is the assertion of Gaudina that he sustained his burden of proof that he did not know in the exercise of reasonable care of the untruth or omission of material facts. This burden is placed upon any person who sells a security by § 17–117.22(a)(2), W.S. 1957, C.1965, now § 17–4–122(a)(ii), W.S. 1977. The Supreme Court of the United States has approved this shifting of the burden under the federal act. *Wilko v. Swan*, 346 U.S. 427, 431, 74 S.Ct. 182, 184, 98 L.Ed. 168, 173 (1953). However, it does not make any difference whether he knew the truth of the statements he made.

Gaudina was a person unlawfully acting as an agent in the sale of unexempt securities and had not registered as such an agent as required by § 17–117.3, W.S.1957, C.1965, now § 17–4–103, W.S.1977, supra fn. 7. This automatically made him civilly liable under § 17–117.22(a)(1), W.S.1957, C.1965, now § 17–4–122(a)(i), W.S.1977, fn. 7. The various unlawful acts creating civil liability are in the alternative, as underscored. Gaudina was a person who sold nonexempt, unregistered securities in violation of § 17–117.7, W.S.1957, C.1965, now § 17–4–107, W.S.1977. This also automatically created civil liability under § 17–117.22(a)(1), W.S.1957, C.1965, now § 17–4–122(a)(i), W.S.1977.

In *Cola v. Terzano*, 129 N.J.Super. 47, 322 A.2d 195 (1974) it was held that the state's Uniform Securities Law was intended to protect the uninitiated and to prevent fraud on the public. All who participated in the sale of an unregistered security, including the salesman, have a civil liability. An agent is charged with knowledge of the registration requirements and liable for his assistance in the distribution of unregistered securities. The court held that it is clear that liability attaches "by operation of law" to the sale by any person of any nonexempt, unregistered security and gives rise to a cause of action against all those who participated in the sale.

Recovery under the Uniform Securities Act does not depend upon a showing of a seller's consciousness of the falsity of the material misrepresentations he makes. *Bradley v. Hullander*, 272 S.C. 6, 249 S.E.2d 486, 499 (1978). Agents are charged with knowledge of registration requirements and there is a duty not to assist unlawful sales; civil liability follows as a matter of course. *Young v. Kwock*, 52 Haw. 273, 474 P.2d 285, 44 A.L.R.3d 582 (1970); *Giordano v. Auditore*, 355 Mass. 254, 244 N.E.2d 555 (1969); *Miller v. Griffith*, Ohio, 196 N.E.2d 154 (1961). Liability under the Connecticut Blue Sky Laws, similar to our securities law, for sale of unregistered securities rests on the sale itself and knowledge of the fraud or good faith is immaterial. *Moerman v. Zipco, Inc.*, 302 F.Supp. 439 (E.D.N.Y.1969), aff'd 422 F.2d 871 (1970).

We need go no further in the consideration of this question. Section 17–117.22(a)(2), W.S.1957, C.1965, now § 17–4–122(a)(ii), W.S.1977, pertaining to ignorance of the untruth of material facts, applies to situations regardless of whether the security is registered, exempted, or sold in violation of the registration requirements. 7A U.L.A. 671–672, Commissioners' Note. We need not reach these matters.

The only facts necessary are that a security was sold, that it was unregistered, and that it was not exempt. Here the security was not only unregistered but it was also sold by an unregistered agent, which also creates civil liability without more.

## III

Gaudina claims that the trial court in the award of judgment should have set

"Each trust company may:

"(i) Act or be appointed by any court to act in like manner as an individual, as * * *

trustee, * * * or in any other fiduciary or representative capacity for any purpose permitted by law."

off the value of property still held by the Habermans. The testimony and exhibits disclose that one of the investments made by Heritage was the purchase of four unimproved, one and one-half acre lots with no water in a subdivision out in the middle of some of the nowhere of Arizona, twelve miles out of Elkhorn. The Habermans' trust account was charged $4,500.00 for one and $6,000.00 for each of the other three, for a total of $22,500.00, subject to a first mortgage of an Arizona bank. They each apparently have a value of $800.00 if free and clear but are subject to a mortgage of $3,500.00 against each, $2,700.00 more than they were worth. Though the figure does not appear to be exact, the Habermans received about $1,000.00 from Heritage by way of interest. They have lost the entirety of their principal. Under the clear provision of § 17-117.22(a), W.S.1957, C.1965, now § 17-4-122(a), W.S.1977, $1,000.00 must be deducted from that part of the judgment allowing 6% statutory interest. The statute provides for "less the amount of any income received on the security."

## IV

Gaudina asks whether there was sufficient evidence to support the judgment against him. As set out in Parts I and II of this opinion, all the evidence necessary to create civil liability under the Wyoming Uniform Securities Act was present. Gaudina's admissions dissipated any conflict in the evidence.

## V

Gaudina's final claim is that the district court abused its discretion in failing to dismiss the complaint pursuant to Gaudina's motion to dismiss after remand by this court as an outcome of the first appeal. Gaudina argues that since the case was remanded on September 21, 1978 (the mandate of this court is dated September 19, 1978), his motion to dismiss for failure to prosecute the case filed on August 24, 1979 should have been granted, citing Rule 14, Uniform District Court Rules and Rule 41(b), W.R.C.P.[14]

■ It should be noted that the language of the rules cited is expressed as permissive rather than mandatory. The record discloses that some four years of delay had been created by Bromley and Gaudina through failure to appear for the taking of depositions and their judge shopping for continuances of various procedural events set for hearing. It appears that the district judge, who usually presided over this case, closely controls his own docket without prodding by counsel and assumed responsibility for the delay in question because following remand by this court the clerk of the district court inadvertently placed the case in the records of closed cases and its pendency was not called to his attention. In the light of those preceding events, the motion to dismiss was denied for what we see as a decision based upon what the presiding judge considered an injustice to the Habermans, if he should do otherwise. Additionally, courts favor a policy of disposition of cases on their merits. 9 Wright & Miller, Federal Practice and Procedure: Civil, § 2370, pp. 216–17. Gaudina makes no showing of prejudice. The remedy of involuntary dismissal under the circumstances here rests within the sound discretion of the trial court. *Food Basket, Inc. v. Albertson's, Inc.*, 416 F.2d 937 (10th Cir. 1969).

■ We wish it understood, however, that this court by its ruling on this issue in this case does not intend to in any way abrogate the power of trial courts, acting on their own initiative or upon motion of a party to clear their calendars of cases that

---

14. Rule 14, Uniform District Court Rules:

"Cases on the docket in which no substantial and bona fide action towards disposition has been taken for six (6) months are subject to dismissal for lack of prosecution."
Rule 41(b), W.R.C.P.:

"(1) For failure of the plaintiff to prosecute * * * a defendant may move for dismissal of an action or of any claim against him. * * *
"(2) Upon its own motion the court may dismiss without prejudice any action not prosecuted or brought to trial with due diligence."

have remained dormant because of the inaction or dilatoriness of parties seeking relief. *Link v. Wabash Railroad Company,* 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). Involuntary dismissal requires a weighing of circumstances and judicial policies.

Affirmed, except that the district court is instructed to deduct $1,000.00 from the allowance of 6% statutory interest and amend its judgment accordingly.