Rex A. SHEPPERD and Steve Edwards,
Plaintiffs–Appellants,

v.

BOETTCHER & COMPANY, INC.,
Defendant–Appellee.

No. 87–132.

Supreme Court of Wyoming.

May 17, 1988.

Richard Miller, Casper, Edward J. Pluimer and Peter M. Lancaster of Dorsey & Whitney, Minneapolis, Minn., for plaintiffs-appellants.

William E. Murane, Jeffrey T. Johnson, and A. Bruce Jones of Holland & Hart, Denver, Colo., Jack D. Palma, II, of Holland & Hart, Cheyenne, for defendant-appellee.

Joseph B. Meyer, Atty. Gen., Gay Woodhouse, Sr. Asst. Atty. Gen., for amicus curiae Wyoming Secretary of State.

Before THOMAS, CARDINE, URBIGKIT and MACY, JJ., and KAIL, District Judge.

URBIGKIT, Justice.

By certification from the United States Court of Appeals for the Tenth Circuit, this court determines as a question of Wyoming law:

"Does the sale of an undivided one-and-two-thirds per cent working interest in an oil and gas lease constitute a 'security' as defined by the Wyoming Uniform Securities Act, Wyo.Stat.Ann. § 17–4–101 et seq., when the owner of

the operating interest retains exclusive control over the drilling operations?"

This certified question is answered "Yes," subject to circumstances of the individual sales transaction which would be factually determinative.

A state law claim was filed under 28 U.S.C. § 1332 by diversity jurisdiction in the United States District Court, District of Wyoming which alleged state security law violations. That court dismissed pursuant to Rule 12(b)(6), F.R.C.P. for failure to state a claim upon which relief can be granted, and appeal to the Tenth Circuit Court of Appeals resulted in the present certification to this court pursuant to Rule 11.01, W.R.A.P.

From the facts stated in the certification as extrapolated by the Tenth Circuit Court of Appeals from the original complaint, we discern, as pleading contentions subjected only to a motion-to-dismiss response, that defendant Boettcher & Company, Inc. (Boettcher), a securities broker-dealer, solicited the sale

"* * * of certain undivided fractional working interests in oil, gas and mineral leases in Louisiana operated by Latham Exploration Company, Inc. ('Lexco'). Pursuant to this solicitation, plaintiffs Rex Shepperd and Steve Edwards each purchased an undivided one-and-two-thirds per cent working interest by entering into two participation agreements on October 22, 1985, which obligated them to pay a proportionate share of the costs to be incurred in drilling operations. According to the participation agreements, Lexco retained complete control over managerial decisions associated with drilling operations. The complaint

states: '[Plaintiffs Shepperd and Edwards] did not receive with their working interests/securities the right to exercise practical and actual control over the managerial decisions associated with the drilling operations or any Lexco enterprise; the participation agreements provided Lexco complete control over all drilling operations.' Shepperd and Edwards' investments proved unsuccessful, and they each lost $142,982.23."

With professed violations of filing and registration requirements under the Wyoming Uniform Securities Act, § 17–4–101 et seq., W.S.1977, plaintiffs sought compensatory damages, prejudgment interest, costs, and attorneys' fees. The complaint was dismissed with prejudice when the federal district court (in reliance on a 1962 opinion of the Wyoming Attorney General) agreed with the securities broker-dealer that the Wyoming legislature had intended to exclude all oil and gas interests from the scope of its definition of a security. See *Shepperd v. Boettcher & Company, Inc.*, 613 F.Supp. 287 (D.Wyo.1985).[1] The Tenth Circuit Court of Appeals, in concluding that the proceeding involved an important question of policy under Wyoming law, certified the legal question to this court in order to afford an opportunity for state court analysis of this important aspect of Wyoming statutory security-regulation law.

The issue is emplaced by Wyoming legislative adoption of the definition of security for the purpose of the enactment of its version of the Uniform Securities Act by Ch. 160, S.L. of Wyoming 1965, § 17–4–101, W.S.1977. See general background discussion in Comment, *The Wyo-*

---

1. See persuasive and thoughtful analysis in Note, *Oil and Gas Leases: Should They Be Considered Securities? Shepperd v. Boettcher & Co. Inc.*, XXI Land & Water L.Rev. 99 (1986) (not cited in appellate briefs here or in the Tenth Circuit Court of Appeals, although noted by annotation in the Wyoming statutes). The 1962 opinion of the Attorney General reversed an earlier opinion, AG Ops. 1953–56, p. 35 of 1953. The earlier opinion followed the broad language and generous authority of the United States Supreme Court in *Securities and Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244, reh. denied 329 U.S. 819, 67 S.Ct. 27, 91 L.Ed. 697 (1946), and *Securities and Exchange Commission v. C.M. Joiner Leasing Corporation*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), as a "substance, not form" evaluation determined by the factual situations involved. The latter Attorney General opinion, in reversal, derived a contrary legislative intent from amendatory history of the present Wyoming securities law during its passage. The differentiated Attorney General opinions on the same subject illustrated the two diametrically different statutory analyses and interpretative approaches: legislative history versus text of language used.

*ming Uniform Securities Act—A Review,* I Land & Water L.Rev. 271 (1966). The Wyoming law developed a difference in phraseology by amendments of the initially used model act before its final passage. S.F. No. 10, Senate Digest 1965 at 56.

Consequently, a legislative-intent inquiry developed in the decision of the district court that deletion of a "certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease as one type of defined security," dispositively excluded the contested sales transaction from encompassing a covered security for regulatory purposes under the act. The enactment result had been to delete the express inclusion as found in the Uniform Securities Act, § 401(1), and in the federal law, 15 U.S.C. 77b(1), without the substitution of an express exclusion as enacted in at least one state (Oklahoma). See *State ex rel. Day v. Petco Oil & Gas,* Okla., 558 P.2d 1163 (1977) and 71 Okla.Stat. § 2(1) Laws 1961, p. 58.

The practical proposition now presented is whether these customer-purchasers of the oil play investment interest stated a security act nonregistration claim in their complaints against the broker-dealer. It was generally recognized by counsel in oral argument that coverage would probably exist in sister jurisdictions under laws and

adopted precedent, but that the identical status of security law phraseology is novel to Wyoming.[2]

The secretary of state, as the entity responsible for act enforcement, filed an amicus curiae brief in strong opposition to the federal district court decision since that court not only found an exclusion by deletion, but also found that the rules and regulations of the secretary of state which defined covered investment contracts as including oil and gas working interests are "contrary to the legislative intent behind the Wyoming Uniform Securities Act." *Shepperd v. Boettcher & Company, Inc.,* supra, 613 F.Supp. at 290.

To address the specific issue certified, we have to define the subject of the sale as alleged in the complaint. The nature of the cost contributory working interest with severed right of management is clearly definable as a separate category of oil interest participation adventure for the speculator or investor. It is not a horse for widows, orphans, or trust managers to ride. Risk and cost are related to the status of indeterminate obligation, and benefit or profit is subject to drilling successes and suitability of profit attribution and divisional fairness as effectuated by promotional characteristics. The significant number of securities act cases involving this kind of asset is demonstrative of the risks.[3]

---

2. Cases considering fractional oil and gas interests within the enveloped transactional parameters under state security civil and criminal regulatory systems include *Upton v. Trinidad Petroleum Corp.,* 652 F.2d 424 (5th Cir.1981), applying Alabama law; *People v. Blankenship,* 305 Mich. 79, 8 N.W.2d 919 (1943); and *Commonwealth v. Yaste,* 166 Pa.Super. 275, 70 A.2d 685 (1950). See likewise, *Oil Lease Service, Inc. v. Stephenson,* 162 Cal.App.2d 100, 327 P.2d 628 (1958); *O'Neill v. State,* Fla.App., 336 So.2d 699 (1976); *State v. Walters,* 244 Iowa 1253, 58 N.W.2d 4 (1953); *Caldwell v. Trans–Gulf Petroleum Corporation,* La., 322 So.2d 171 (1975); *Prince v. Heritage Oil Co.,* 109 Mich.App. 189, 311 N.W.2d 741 (1981); *State v. Golden,* 216 Minn. 97, 12 N.W.2d 617 (1943); *Gales v. Weldon,* Mo., 282 S.W.2d 522 (1955); *State ex rel. Day v. Petco Oil & Gas,* supra. See also, *Hayden v. McDonald,* 742 F.2d 423 (8th Cir.1984), overruled on other grounds sub nom. *Austin v. Loftsgaarden,* 768 F.2d 949 (8th Cir.1985), applied Minnesota law; *Parvin v. Davis Oil Co.,* 524 F.2d 112 (9th Cir. 1975), applied California law; *Scheve v. Clark,*

596 F.Supp. 592 (E.D.Mo.1984), applied both state and federal law; *Witter v. Buchanan,* 132 Ill.App.3d 273, 87 Ill.Dec. 131, 476 N.E.2d 1123 (1985); *Petroleum Resource Development Corp. v. State ex rel. Day,* Okla., 585 P.2d 346 (1978); *State v. Pullen,* 58 R.I. 294, 192 A. 473 (1937) and *Kadane v. Clark,* 135 Tex. 496, 143 S.W.2d 197 (1940). Two cases of a contrary conviction and conclusion were *Smith v. Wedding,* Ky., 303 S.W.2d 322 (1957); and *State v. Allen,* 216 N.C. 621, 5 S.E.2d 844 (1939).

3. Footnote 1, supra, is only illustrative. In the federal courts, under federal security regulation, an early case, *Securities and Exchange Commission v. C.M. Joiner Leasing Corporation,* supra n. 1, involved one brand of this investment technique. Similar to state court cases, federal decisions inviting security regulation to programs for sales of fractional oil and gas interests are numerous. In addition to the detailed case resulting from John King's oil operations in Denver, Colorado, *Fund of Funds, Limited v. Arthur Andersen & Co.,* 545 F.Supp. 1314

In dealing with the specified property classification of the working interest with severed rights of control, definitions are required. By name, working interest is the leasehold right as the interest providing the right to work. Any fractional working interest is consequently severed from that estate. It can be carried or participating, dependent upon proportional responsibility to contribute to costs of drilling and development expenses. Clearly, from the minimum information here, this investment included a participative responsibility in cost. We now add—or extract from the nature of the normal working interest as some fraction of the original leasehold estate—another function, partnership or venture control which either remains with or is assigned to the owner of the operating interest. In result, the purchaser of the participating working interest with severed rights of control has certain contractual rights and obligations by contract, but not by property ownership.[4]

If intention is to be defined in legislation, the deletion of the explicit inclusion of "a certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease" and countervailing disinclination to state an express exclusion of the interest from the definition of the security, leads this court to conclude that the interest or participation is by definition neither expressly included nor expressly excluded under the law as a covered security. Consequently, regulatory inclusion is dependent upon the essential purchase transaction within which the determiner of fact is entitled to consider the severed right of control applicable to the nature of the investment as acquired.[5]

(S.D.N.Y.1982), other representative cases include: *Simon Oil Co., Ltd. v. Norman*, 789 F.2d 780 (9th Cir.1986); *San Francisco–Oklahoma Petroleum Exploration Corp. v. Carstan Oil Co., Inc.*, 765 F.2d 962 (10th Cir.1985); *Penturelli v. Spector, Cohen, Gadon & Rosen*, 779 F.2d 160 (3rd Cir.1985); *Scheve v. Clark*, supra n. 2 and *Johnsen v. Rogers*, 551 F.Supp. 281 (C.D.Cal. 1982). Cf. *Woodward v. Wright*, 266 F.2d 108 (10th Cir.1959), where countervailing factors of the intrinsic transaction were sufficient to deny the security designation for regulation.

**4.** In general usage involving basic oil and gas leases, a working interest is the interest acquired by the lessee with a royalty interest retained as the lessor's interest. *Davis v. Hurst*, 150 Kan. 130, 90 P.2d 1100 (1939); *Miller v. Schwartz*, N.D., 354 N.W.2d 685 (1984); 8 Williams and Meyers Oil and Gas Law, Manual of Oil & Gas Terms, p. 1086; 46 Words and Phrases, Working Interest, p. 280. In the ingenuity of investment and financing transactions, the remerchandising of a portion of the acquired leasehold estate as fractional working interest can occur in a multitude of differing dimensions encompassing different aspects. In general, such interests can be carried-working, see 5 Kuntz Oil and Gas, § 63.4, or cost-participating, as exists apparently in the interests involved in this litigation. A further mutation can occur whether the assigned interest is carried or participating, by agreement terms which detach rights of participation in control which would otherwise exist from fractional ownership. It is in the nature of the agreements by which the rights and obligations are derived that the intrinsic nature and risk of the investment is defined. In the nature of terminology, there is presented here a participating, severed-control,

fractional working interest. *Phillips Petroleum v. Oldland*, 187 F.2d 780 (10th Cir.), cert. denied 342 U.S. 816, 72 S.Ct. 37, 96 L.Ed. 617 (1951).

An anomaly is denoted from a quotation from *Miller v. Schwartz*, supra, 354 N.W.2d at 689: " 'The interest acquired by the lessee under an ordinary oil and gas lease is known as a working interest and is an interest in real property.' A 'working interest' has also been defined as '(t)he operating interest under an oil and gas lease. The owner of the working interest has the exclusive right to exploit the minerals on the land.' " Quoting *Corbett v. LaBere*, N.D., 68 N.W.2d 211 (1955). Differing from that definition, this character or kind of working interest with severed control detaches the essence of the original working interest which was the exclusive right to exploit. See 3 Summers Oil and Gas, Ch. 19, § 556, Partial Assignments of Lessee's Interest—Percents—Fractional Interests, p. 686. In pure logic, a severed-control working interest has something antithetical in its nature since working interest originally denoted control. Consequently, there is something here akin to nonworking interest diagonally sliced fractional share of the working interest, or perhaps a cost participative production interest as definable in trial evidence and documentary development.

**5.** We only answer the question here presented and do not address what differences may exist if the owner of the operational interest had not retained exclusive control when the working interest was packaged for sale to investors. The fact of severed control may not separately be dispositive of the nature of the investment in definition of Wyoming security statutes. Statutory exceptions will also be significant in deter-

It is clear, as denominated only by the certification record, that whatever the plaintiffs purchased, their participation was more than a payment agreement to purchase a definable real estate interest. Rather, it is observable that they contractually acquired some character of contributory responsibilities and profit anticipation while the owner of the operating interest retains exclusive control over the drilling operations. In their brief, appellants posit this perception:

> "It is a question for the [trial] Court to decide, however, not on the basis of the label defendant would apply to the instrument, but on a complete factual picture of the transaction: the terms of the contract, plaintiff's involvement in the management and operation of the enterprise, defendant's role in promoting and selling it, including the size of the commission it received, and any other facts surrounding the transaction that make clear the investor's relationship to the investment enterprise."

The basic Wyoming case interpretive of the securities act is *Gaudina v. Haberman*, Wyo., 644 P.2d 159 (1982). In the context of that case as applied to the participation agreement here, "[t]here is no doubt that the investment document was a security." Id. at 163. At issue only is whether this brand of security is excluded from statutory coverage because of the character of the included asset. We do not determine that each acquired asset interest of a nonworking interest with severed right of management control is necessarily a security if not so packaged, but only that a security does not become excludable because of the type of asset utilized for the sales program. It is the substance of the rights and obligations as documented in offerings, sales material, and defined agreement as the investment, which will be determinative of status as a security under Wyoming law. This is the application of the facts-and-circumstances rule for security-status determination in applying the

mining whether the interest was a covered security as compared with a simple lease interest assignment transaction as exceptions are generally provided in § 17–4–114, W.S.1977, and spe-

"certificate of interest or participation in any profit sharing agreement" determinates of § 17–4–113(a)(xi), W.S.1977.

Litigants have led us to cases which we do not find inapposite to the decision now adopted. *Smith v. Wedding*, Ky., 303 S.W. 2d 322 (1957), was the early case used both in the 1962 Attorney General opinion and by the United States District Court. See similarly resolved *State v. Allen*, 216 N.C. 621, 5 S.E.2d 844 (1939). In Wedding, the court found the owner of an undivided working interest in an oil lease to be a tenant in common in a chattel real. In recognizing this tenancy, the court did not consider any real property status differential if control was severed, since the issue was not presented factually. The contemporaneous investment package effect, if any, was similarly not addressed.

The countervailing and generally followed case is *State ex rel. Day v. Petco Oil & Gas, Inc.*, supra, 558 P.2d 1163, which followed an earlier federal court case, *Gaillard v. Field*, 381 F.2d 25 (10th Cir.1967), cert. denied 389 U.S. 1044, 88 S.Ct. 787, 19 L.Ed.2d 836 (1968). In Gaillard, the federal court expressly interpreted the law of Oklahoma and found in the "deep-rooted tradition of the common weal in Oklahoma" that there was a security-act exclusion of purchased fractional interests in oil and gas leases.

This deep-rooted tradition of the common weal was differently defined by the Oklahoma Supreme Court in Petco in finding the federal court examination of its legislative history unpersuasive. That state court recognized that the statutorily exempt lease-interest language would not necessarily exclude a definable security when the entire investment package is considered.

> "In examining the investment package sold by Petco, we find that it constitutes a security under the definition of a security [under Oklahoma law].
>
> "The package sold by Petco requires the investment of money.

cifically the confined transactional exposure excepted out by subsection (b)(ix) of exposure to not more than 15 persons within 12 consecutive months.

"The package sold by Petco takes investor's money and subjects it to the risk of the venture, thus constituting risk capital.

"The package sold by Petco offers to the investors an expectation of a benefit, in this instance a profit.

"The package sold by Petco provided that the investors would have no direct control over the investment or policy decision of the venture. It is clear from the operation agreement, that any profit or benefit to be derived from a leaseholder's investment is to be the product of the actions and decisions of the operator and that the investors do not participate in the decisions and actions involved.

"Thus, the package being offered and sold by Petco, although it contains an exempt lease interest, clearly constitutes a security under the definition of a security [under Oklahoma law]." *State ex rel. Day v. Petco Oil & Gas, Inc.*, supra, 558 P.2d at 1167.

In accord with the general trend of the cases, including a significant number in the federal courts, we would follow Petco and the basic case of fractional interest, *Securities and Exchange Commission v. C.M. Joiner Leasing Corporation*, 320 U.S. 344, 352, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943):

"The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as this it is not inappropriate that the promoters' offerings be judged as being what they were represented to be."

Joiner, in decisional sequence had followed the citrus-grove adaptation of security law in the seminal discussion of *Securities and Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 298, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244, reh. denied 329 U.S. 819, 67 S.Ct. 27, 91 L.Ed. 697 (1946):

"Form was disregarded for substance and emphasis was placed upon economic reality. An investment contract thus came to mean a contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment.' * * * This definition was uniformly applied by state courts to a variety of situations where individuals were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the efforts of the promoter or of someone other than themselves."

The principle has been applied more recently in *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) to shares in a state-chartered savings and loan association as the misplaced emphasis of the Court of Appeals was reversed in determining that a security was created. See also 12 Long, Blue Sky Law, Ch. 2, What is a Security?, p. 2–1, and *Howey*, Definition Components, § 2.01(2), p. 2–6.8.[6]

■ Additionally it must be recognized that not every participation in some business enterprise or investment in oil activities results in a security transaction under the regulatory systems of either Wyoming blue sky or federal securities law. As was carefully recognized by the Tenth Circuit in *Ballard & Cordell Corp. v. Zoller & Danneberg Exploration, Ltd.*, 544 F.2d 1059 (10th Cir.1976), cert. denied 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1060 (1977), the transfer of no more than a naked leasehold interest right is to be recognized as a significant evidentiary factor in analysis of the economic reality of the transaction. Comparable to the sale of all of the oil interest or a fractional interest uncluttered with participative agreement is the sale of all of the stock in an existent business. *Ruefenacht v. O'Halloran*, 737 F.2d 320 (3d Cir.1984), aff'd sub nom. *Gould v. Rue-*

---

**6.** A comprehensive analysis of state rules on public oil and gas programs, including Wyoming within the North American Security Administrators Association Rules, is provided in Fass and Wittner, Blue Sky Practice (1987). Conversely, if the legislature concludes that the broadly protective umbrella to be found in application of Gaudina, Petco and Joiner is undesired, future legislation can be directly applied to narrow the protection by limitation of security act coverage. We consider that decision clearly to belong to the legislature.

*fenacht,* 471 U.S. 701, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985); *Woodward v. Wright,* 266 F.2d 108 (10th Cir.1959). This facts-and-circumstances analysis as an approach we apply to the Wyoming securities law is in accord with *Gaudina v. Haberman,* supra, and has been consistently used by most federal courts and specifically the Tenth Circuit Court of Appeals in the variety of circumstances presented. See *Vincent v. Moench,* 473 F.2d 430 (10th Cir. 1973) (sale of a family business). See also the extended review and complex application of the securities law to fractional undivided interest in oil, gas, and mineral rights in *Fund of Funds, Limited v. Arthur Andersen & Co.,* 545 F.Supp. 1314, 1348 (S.D. N.Y.1982), where, in quoting from *Williamson v. Tucker,* 645 F.2d 404, 422 (5th Cir.), cert. denied 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981), the court analyzed the factors of management and control:

> "If, for example, the partner has irrevocably delegated his powers, or is incapable of exercising them, or is so dependent on the particular expertise of the promoter or manager that he has no reasonable alternative to reliance on that person, then his partnership powers may be inadequate to protect him from the dependence on others which is implicit in an investment contract.
>
> "Thus, a general partnership in which some agreement among the partners places the controlling power in the hands of certain managing partners may be an investment contract with respect to the other partners * * *."

The principles adduced which define the regulated security as an instrument lacking power of management and control would specifically apply to the fractional working interest with severed right of control.[7] The basic criterion adopted by this court is that application of Wyoming security regulation law and its statutory history neither expressly includes nor expressly excludes severed control working interests in oil and gas properties, but that the essential character of the investment as a purchased assemblage of rights and obligations would determine its security characterization for statutory inclusion or exclusion.

Essentially, Boettcher distinguishes Petco and its authority by contention that plaintiffs failed to adequately plead more than the "fractional interest" as would have been involved in the sale by Boettcher to the plaintiffs. We do not find the certification to be commensurately confined. There is demonstrable conflict, at least from argument in briefs, as to exactly what Shepperd and Edwards purchased from Boettcher. The nature of the record and the certified question inquiry deters this court from proceeding beyond the directly certified designation of a working interest with operator-retained, exclusive control. Appellants generally confined their description to the characterization included in their complaint as recited in certification submission. Contrarily, at least in argument, Boettcher appears to foreclose our consideration of the participation agreement and its security status. We decline the invitation, since the certification by which we are controlled recognizes the alleged existence of the investment agreements. Our decision would be meaningless in statutory interpretation if not recognizing the controlling question to be as yet undetermined as what was actually bought and sold.[8]

---

7. The categories of cases are as infinite as the ingenuity of man's search to acquire the money of another for investment or by promotion.

   "What do the following have in common: scotch whiskey, self-improvement courses, cosmetics, earthworms, beavers, muskrats, rabbits, chinchillas, fishing boats, vacuum cleaners, cemetery lots, and fruit trees? The answer is that they have all been held to be securities within the meaning of federal or state securities statutes." Thomas Lee Hazen, The Law of Securities Regulation, § 1.5, p. 14 (1985).

8. Considering procedurally that the case has achieved only a motion-to-dismiss status, it would be improvident for this court to dispositively assume specifics of final trial evidence.

   Boettcher stated in its brief:

   "[Appellants'] complaint clearly alleges that Boettcher solicited their investment in 'working interests.' Plaintiffs, however, acquired these working interests by entering into participation agreements with a third party—Latham Exploration Co. ('Lexco'). * * * Under the rationale of Petco Oil, the participation

Differing from the more recent opinion of the Attorney General, as here presented by the certified question, we infuse only the express statutory language which neither specifically excludes nor implicitly includes oil and gas working interests as an investment asset within the security definition. Retention of exclusive control by the owner is significant to the evidence but not necessarily controlling.

The categorical answer to the certified question submitted to this court by the United States Court of Appeals for the Tenth Circuit must accordingly be "Yes." This answer, however, is subject to what has been said in this opinion as further trial proceedings may address specific facts and actual documents to be found to have been involved in the questioned transaction.

THOMAS, Justice, concurring:

I agree with the majority of the court that the question certified to us by the United States Court of Appeals for the Tenth Circuit should be answered "yes." I therefore concur in the result, but I cannot join in the portions of the opinion that speculate about other possible factual situations. In my view, in those instances in which we agree to entertain questions certified to us from the federal courts, it is better jurisprudence to limit the discussion strictly to the question addressed to this court. Dictum in such an instance is really dictum once removed and probably suffers

from many of the same disadvantages as multiple hearsay.

agreements might render the working interests as part of an investment package. The working interests themselves, however, based upon the legislative intent as discerned by Judge Kerr, were not securities."

The State amplified our store of available information and nonrecord documentation by the attachment of the complaint from the United States District Court, wherein it was stated:

"8. Through its agent Phillip Black, Boettcher solicited the purchase of and offered to sell such working interests/securities to Shepperd and Edwards. Boettcher provided Shepperd and Edwards information and sales and advertising literature about the working interests/securities, arranged communications with Lexco personnel, praised the management and operations of Lexco, and recommended that plaintiffs purchase the interests.

"9. Shepperd and Edwards purchased the working interests/securities by entering into two participation agreements dated October 22, 1982, for certain oil, gas, and mineral leases with Lexco. They each purchased an undivided one and two-thirds per cent (1⅔%) working interest, which obligated them to bear proportionate shares of costs and risks incurred in drilling operations. The cost of the working interests/securities eventually totalled $530,131.20 each. They did not receive with their working interests/securities the right to exercise practical and actual control over the managerial decisions associated with the drilling operations or any Lexco enterprise; the participation agreements provided Lexco complete control over all drilling operations."